UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| FRANK SAVEL et al., | : | CASE NO. 22-cv-2154 |
| | : | |
| Plaintiffs, | : | OPINION & ORDER |
| | : | [Resolving Doc. 12] |
| v. | : | |
| | : | |
| THE METROHEALTH SYSTEM, | : | |
| | : | |
| Defendant. | : | |
| | : | |

JAMES S. GWIN, UNITED STATES DISTRICT COURT JUDGE:

Plaintiff Frank Savel and 45 named Co-Plaintiffs sue Defendant The MetroHealth System ("MetroHealth") in a putative class action for religious discrimination.

Plaintiffs work or formerly worked as MetroHealth employees.  They argue that during Fall 2021 and Spring 2022, MetroHealth adopted mandatory workplace COVID-19 vaccination policies that discriminated against Plaintiffs' religious beliefs and created hostile working environments.

After earlier announcing a mandatory vaccination deadline, MetroHealth re-evaluated its vaccine policy and granted exemptions to all of the Plaintiffs who were still working at MetroHealth.  The rest had resigned before MetroHealth ever took any adverse employment action against them.

The Court finds that some Plaintiffs have not alleged an injury sufficient to give standing to bring their Title VII and Ohio R.C. § 4112 claims. The remainder fail to state claims for religious discrimination under Title VII and R.C. § 4112 because they do not allege that they have been disciplined, discharged, or subjected to materially adverse

Case No. 22-cv-2154
GWIN, J.

employment actions. Separately, to the extent that Plaintiffs seek prospective relief for

federal and state constitutional claims, those claims are either moot or not ripe.

So, the Court **GRANTS** Defendant MetroHealth's motion to dismiss as to all counts.

I.      Background

The Court summarizes the facts alleged in Plaintiffs' Complaint.

Defendant MetroHealth operates as a county-owned hospital in Cuyahoga County,

Ohio.[1] MetroHealth employees work as state employees.[2]

On August 26, 2021, MetroHealth announced a future requirement that its workforce

be fully vaccinated against COVID-19 by October 30, 2021.[3] MetroHealth also said that

employees could, with proper documentation, request health- and religion-based vaccine

exemptions.[4] With one exception,[5] the Plaintiffs in this case made religious-exemption

requests.[6]

Apparently surprised by the number of exemption requests, on October 15, 2021,

MetroHealth announced that MetroHealth would not enforce the vaccine mandate against

exemption-seekers until the hospital had sufficient time to review the more than 400

exemption requests that MetroHealth had received.[7]  Because MetroHealth had not been

able to review the exemption requests, MetroHealth said it would not discipline employees

---

[1] Doc. 2 at PageID 6.
[2] *Id.* at PageID 7.
[3] *Id.* at PageID 8.
[4] *Id.* at PageID 8–9.
[5] Plaintiffs concede that Plaintiff 8, Sheila Petro, never submitted an exemption request. *See id.* at PageID 25.
[6] Some Plaintiffs also submitted requests for flu vaccine exemptions. Because the Court's analysis of the COVID-19 vaccine exemptions applies equally to the flu vaccine exemptions, the Court will discuss only the COVID-19 vaccine exemptions in depth.
[7] *Id.* at PageID 10.

Case No. 22-cv-2154
GWIN, J.

who had earlier submitted health or religion exemption requests until MetroHealth could review their requests.[8]

On February 7, 2022, MetroHealth blanket denied those Plaintiffs who were still awaiting responses to their exemption requests.[9] Apparently because these Plaintiffs had patient-facing or public-facing positions, MetroHealth told Plaintiffs that accommodating their requests would cause the hospital undue hardship because the denied employees had job roles that could not be remotely performed.[10]

With the February 7, 2022, communication, the hospital told the employees who received exemption denials they would have 45 days to receive both COVID-19 vaccine doses.[11] Under the hospital's February 7, 2022, notice, the 45-day vaccine documentation period would expire on March 24, 2022.

Plaintiffs allege that MetroHealth categorically denied all religious accommodation requests, but granted some health-related exemptions requests.[12]

However, MetroHealth then again changed its COVID-19 vaccine requirement.  On March 15, 2022, and before the earlier-announced March 24, 2022, deadline, MetroHealth changed its position to accommodate religious exemptions even for employees whose jobs were not classified as fully remote.  In explaining its decision to grant the exemptions, MetroHealth's CEO couched the change against a backdrop of declining COVID-19

---

[8] *Id.*

[9] The Complaint alleges that at some point after submitting their requests, four of the Plaintiffs in this case chose to receive the COVID-19 vaccine. The Complaint does not specify which Plaintiffs were vaccinated or when. *Id.* at PageID 68. Plaintiffs 4–7 and 9 voluntarily resigned from MetroHealth before receiving an answer to their exemption requests. *Id.* at PageID 21–26.

[10] Doc. 2 at PageID 13.

[11] *Id.* Plaintiffs whose flu vaccine exemptions were also denied also received 45 days to submit documentation of receiving the flu shot. *Id.*

[12] *Id.* at PageID 13.

Case No. 22-cv-2154
GWIN, J.

infections and announced that the "costs and burdens in granting non-medical exemptions [had] changed in a material way."[13]

With the change, the hospital granted Plaintiffs' previously denied exemptions.[14] The following day, the hospital explained that unvaccinated employees would not be terminated but would be required to continue wearing surgical masks and to maintain social distancing whenever possible, including by not eating in group environments such as the cafeteria or break room.[15]

On November 30, 2022, Plaintiffs sued MetroHealth. With their lawsuit, Plaintiffs allege that MetroHealth violated Title VII by discriminating against Plaintiffs based on religion, and that MetroHealth's vaccination policies infringed on Plaintiffs' First Amendment religion free exercise rights.[16] Plaintiffs also bring state-law claims under Articles 1 and 7 Section 1 of the Ohio Constitution and R.C. § 4112.[17]

On March 3, 2023, Defendant moved to dismiss.[18]

---

[13] *Id.* at PageID 15.

[14] *Id.* Again, some Plaintiffs had already voluntarily left MetroHealth or chosen to get vaccinated. MetroHealth also granted previously denied flu vaccine exemption requests.

[15] *Id.* at PageID 16.

[16] The Catholic Church has given authoritative guidance that all the COVID-19 vaccines are morally acceptable and that Catholics have a "duty," "responsibility" or "obligation" to be vaccinated. *See* M. Therese Lysaught, *Catholics seeking 'religious' exemptions to vaccines must follow true church teaching on conscience*, NATIONAL CATHOLIC REPORTER (Sep. 21, 2021), https://www.ncronline.org/news/opinion/catholics-seeking-religious-exemptions-vaccines-must-follow-true-church-teaching (visited June 21, 2023). Jewish religious leaders also give support for COVID-19 vaccinations. Nicole L Muravsky, Grace M Betesh, Rozalina G McCoy, *Religious Doctrine and Attitudes Toward Vaccination in Jewish Law*, J RELIG HEALTH. 2023 Feb; 62(1):373-388 ("In this article, we examine religious doctrine and guidance on vaccination in Orthodox (including Modern Orthodox, Chabad-Lubavich, and Ultra-Orthodox), Conservative, and Reform denominations of Judaism and apply these principles to vaccinations against measles, human papillomavirus (HPV), and COVID-19. We found that the leaders and scholars in these three major denominations of Judaism are uniform in their strong support, often to the point of mandate, for the principles of vaccination.") The Southern Baptist Convention's organization announced last year that it will require missionaries and their children ages 16 and older to be vaccinated against the coronavirus.

[17] *Id.* at PageID 71–74.

[18] Doc. 12.

Case No. 22-cv-2154
GWIN, J.

## II.    Discussion

### A.   Collective Bargaining Agreements

In seeking dismissal, Defendant first argues that the Court lacks jurisdiction to hear claims raised by Plaintiffs 3, 9, 12, 14, and 41 because, as union members employed under collective bargaining agreements ("CBAs"), those Plaintiffs are exclusively limited to grievance procedures under the CBAs.[19] Although the Court agrees that the CBAs, if applicable, would deprive the Court of jurisdiction to hear those Plaintiffs' claims, Defendant does not support its assertion that Plaintiffs 3, 9, 12, 14, and 41 are current or former members of the relevant unions.

#### 1.  Legal Standard

At the motion to dismiss stage, a court must ordinarily accept as true the facts alleged in the Complaint. But when a defendant makes a factual attack on subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1), "a court is free to consider and weigh extrinsic evidence of its own jurisdiction, without granting the plaintiff's allegations any presumption of truthfulness, until the court is satisfied of the existence of its power to hear the case."[20] "Lack of subject matter jurisdiction is a non-waivable, fatal defect."[21]

#### 2.  Analysis

Because Defendant raises a factual attack on the Court's subject-matter jurisdiction, the Court may consider the union contracts that Defendant has attached to their motion to dismiss. Having done so, the Court finds that the contracts would apply to any Plaintiffs who

---

[19] Doc. 12 at PageID 284.
[20] *Ryan v. McDonald*, 191 F. Supp. 3d 729, 735 (N.D. Ohio 2016).
[21] *Id.* (citing *Watson v. Cartee*, 817 F.3d 299, 302–03 (6th Cir.2016)).

Case No. 22-cv-2154
GWIN, J.

are subject to them. But Defendant has not shown which Plaintiffs are employed under the CBAs.

Both CBAs clearly state that the Hospital retains management rights to discipline and discharge employees and to promulgate and enforce reasonable rules and regulations.[22] Both CBAs lay out grievance procedures that apply whenever a dispute arises between the Hospital and any covered employee over "interpretation and/or application of any provision" of the respective CBA, including all disciplinary actions.[23] And under both agreements, the grievance procedures require arbitration for any dispute that the Hospital and the union/aggrieved employee are unable to otherwise resolve.[24]  Finally, both agreements say that the CBAs' grievance procedures are the exclusive means to resolve employee disciplinary disputes.[25]

Although one of the CBAs expired in February 2022 and the other expired in June 2022, these expirations do not stop their application. Post-expiration grievances can arise under a contract when the grievance "involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement."[26] Here, the grievances involve facts that occurred before either CBA expired.  MetroHealth announced its mandatory vaccination policy in August 2021 and denied Plaintiffs' exemption requests in February 2022.

---

[22] Doc. 12-2, Art. IV, Section 10-B in AFSCME Ex.1-I; Art. V, Section 5.03 in OPBA Ex.1-J.
[23] Doc. 12-2, Art. X in AFSCME Ex. 1-I; Art. XI and XII in OPBA Ex. 1-J.
[24] *Id.*
[25] *Id.*
[26] *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B.*, 501 U.S. 190, 205 (1991).

Case No. 22-cv-2154
GWIN, J.

However, Plaintiffs correctly point out that Defendant does not sufficiently allege that Plaintiffs 3, 9, 12, 14, and 41 are union members. The CBAs attached to Defendant's motion do not list members or include member signatures. No other filed documents show union membership. Without evidence and without sufficiently specific union membership allegations, the CBAs alone do not show that the Court lacks jurisdiction.

### B. Counts I and VI: Title VII and R.C. § 4112 Claims

#### 1. Article III Standing

"The standing inquiry is not a merits inquiry."[27] As discussed below, the Court finds that the Plaintiffs who remain employed at MetroHealth have not established a concrete injury and thus lack standing to bring their claims. On the other hand, the Plaintiffs who resigned from MetroHealth sufficiently allege Article III standing and the Court has subject-matter jurisdiction to hear those Plaintiffs' Title VII claims and parallel state-law claims, even if only to ultimately dispose of them.

##### a. Legal Standard

"Article III limits the judicial power to resolving actual 'Cases' and 'Controversies,' not theoretical questions."[28] "And one telltale of a case or controversy is that the parties have standing to bring it."[29] To satisfy "the irreducible constitutional minimum of standing," a plaintiff must have suffered "an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."[30]

---

[27] *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021), *cert. denied sub nom. Brysk v. Herskovitz*, 212 L. Ed. 2d 326, 142 S. Ct. 1369 (2022), *and cert. denied*, 212 L. Ed. 2d 782, 142 S. Ct. 2714 (2022).
[28] *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 860 (6th Cir. 2020).
[29] *Id.*
[30] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up).

Case No. 22-cv-2154
GWIN, J.

Moreover, a plaintiff must allege, and ultimately show, that the defendant's conduct

caused the plaintiff's injury and that that injury is court redressable.[31] Proximate causation

is not a requirement of Article III standing—standing requires only that the plaintiff's injury

be fairly traceable to the defendant's conduct.[32] A plaintiff need not allege that "the

defendant's actions are the very last step in the chain of causation."[33]

> b. Analysis

> i. Standing of Plaintiffs Still Employed at MetroHealth

The Plaintiffs who continue employment at MetroHealth ("employee Plaintiffs")

allege two forms of injury: potential future harm if MetroHealth later revokes their religious

COVID-19 exemptions; and harm from the purported mental and emotional distress of

going through MetroHealth's exemption process. As is discussed below, the Sixth Circuit

has recently found both of these alleged injuries too speculative or conclusory for the

employee Plaintiffs to establish standing.

**Theory 1: Imminent Future Injury**. Most of the named Plaintiffs remain employed at

MetroHealth. MetroHealth gave these employees religious-accommodation exemptions

without taking any adverse employment action. Nevertheless, these non-separated

employees argue that they are under threat of imminent injury because they say that those

exemptions could be revoked.

The Sixth Circuit addressed this exact argument in its recent decision in *Bare v.*

*Cardinal Health, Inc.*[34] In *Bare*, Plaintiff Bare sued his employer, Defendant Cardinal

---

[31] *Id.*
[32] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014).
[33] *Bennett v. Spear*, 520 U.S. 154, 169 (1997).
[34] 2023 WL 395026, at *1 (6th Cir. Jan. 25, 2023).

Case No. 22-cv-2154
GWIN, J.

Health, after Cardinal Health denied Bare's request for a religious exemption from the

company's mandatory COVID-19 vaccination policy.[35] After Bare filed his lawsuit, the

employer changed positions and gave the requested exemption from the employer's

COVID-19 vaccination requirement.[36] Bare then "amended his complaint in an attempt to

convert his suit into a class action."[37] The district court dismissed Bare's amended

complaint for lack of standing.

The *Bare* Sixth Circuit court affirmed the district court's finding that Bare did not

show a cognizable injury. The panel found that "by the time Bare filed his amended

complaint, he had been granted an exemption to the vaccine mandate, staving off any

imminent injury […]."[38] Once Bare had received his exemption, "[a]ny injury to Bare […]

was contingent on future events that may never come to pass," such as the possibility of

Cardinal Health later revoking Bare's exemption.[39] This risk was "much too speculative […]

to satisfy the well-established requirement that threatened injury must be certainly

impending."[40]

Here, the employee Plaintiffs all received vaccine exemptions before they filed this

putative class action. As in *Bare*, the employee Plaintiffs allege no imminent injury, only a

speculative anxiety that they may lose their exemptions in the future. This is insufficient to

give standing either on their own behalf or on behalf of any employees currently seeking

---

[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.* at 2.
[39] *Id.*
[40] *Id.*

Case No. 22-cv-2154
GWIN, J.

exemptions.[41]

### Theory 2: Mental and Emotional Distress.

In the alternative, Plaintiffs also say they suffered mental anxiety during the time MetroHealth announced—but did not enforce—its COVID-19 vaccine requirement. Plaintiffs say this anxiety is sufficient for standing.

However, in *Bare*, the Sixth Circuit found that emotional distress claims associated with the employer's vaccination decision were not injuries that supported standing. In *Bare*, the Plaintiffs alleged having faced the Hobson choice of keeping their jobs or violating their religious beliefs. The *Bare* Plaintiffs alleged: "being subjected to harassment, intimidation and threats as a result of their religious declination of vaccination, which is causing anxiety and stress, as well as mental and emotional anguish to Plaintiffs and their families."[42]

The Sixth Circuit found these allegations "too conclusory to establish a cognizable past injury."[43].

Thus, the current-employee Plaintiffs do not establish standing for their Title VII and R.C. § 4112 claims, and the Court **GRANTS** Defendant's motion to dismiss as to Counts I and VI for those Plaintiffs.

### ii.    Standing of Plaintiffs No Longer Employed at MetroHealth

Nine Plaintiffs no longer work at MetroHealth ("former-employee Plaintiffs"). Of these, one never applied for any religious exemption.  One received an initial denial of his

---

[41] *See also Klaassen v. Trustees of Indiana Univ.*, 24 F.4th 638, 639 (7th Cir. 2022) (noting that seven of the eight student plaintiffs suing Indiana University for its COVID-19 vaccination policy lacked standing because they had qualified for religious exemptions).
[42] First Amended Verified Class Action Complaint at ¶8, *Bare v. Cardinal Health, Inc.*, 2021 WL 9218573 (E.D.Tenn.).
[43] *Bare*, 2023 WL 395026, at *2.

Case No. 22-cv-2154
GWIN, J.

exemption request but quit only after MetroHealth reversed its position and granted him an exemption.  Two quit after their exemption applications were rejected but before MetroHealth reversed its exemption decisions.  And five quit after submitting religious exemption requests but before receiving answers to their requests.

Those Plaintiffs allege economic injuries such as loss of employment, wages, income, retirement benefits, etc. as well as the same types of mental and emotional distress alleged by the employee Plaintiffs. If they can show that they were constructively discharged, Plaintiffs' alleged economic injuries could support standing. The economic injuries are concrete and redressable by the Court through damages.

As to causation, MetroHealth did not terminate any of the nine former-employee Plaintiffs. Rather, the former-employee Plaintiffs argue that they were constructively discharged when, amid a pandemic that killed over a million Americans and more than 4,000 Cuyahoga County residents, MetroHealth required vaccinations.

Regarding Plaintiffs' constructive discharge claim, Plaintiffs must plausibly plead that: (1) the employer deliberately created intolerable working conditions as perceived by a reasonable person; and (2) the employer did so with the intention of forcing the employee to quit.[44]

To make such a constructive discharge claim, Plaintiffs must plausibly allege both that the Defendant created intolerable working conditions and "that Defendants acted with the intent to force Plaintiff to quit [their] job[s]."[45]

Alternatively, Plaintiffs can also plead constructive discharge if they show that they

---

[44] *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir.2005).
[45] *Pozsgai v. Ravenna City Sch. Bd. of Educ.*, 2012 WL 1110013, at *8 (N.D. Ohio Mar. 30, 2012).

Case No. 22-cv-2154
GWIN, J.

resigned when it was absolutely clear that their employer had decided to terminate them anyways.[46]

The Court discusses below whether Plaintiffs plead either form of constructive discharge.

### 2.  Failure to State Title VII and R.C. § 4112 Claims

Even if the current-employee Plaintiffs had established standing, they would fail to state claims under Title VII and R.C. § 4112.02. And although the former-employee Plaintiffs succeed in establishing standing, they likewise fail to state claims for which relief can be granted. The Court will **DISMISS** Counts I and VI as to all Plaintiffs.

### a.  Legal Standard

A complaint survives a motion to dismiss only if it offers sufficient facts which, accepted as true, state a facially plausible claim for relief.[47]  To be plausible, the claim must allow the Court to reasonably infer "that the defendant is liable for the misconduct alleged."[48]  Moreover, the plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully."[49] Although the Court liberally construes the complaint in the plaintiff's favor, the Court need not adopt the complaint's legal conclusions or accept unwarranted factual inferences as true.[50]

### b.  Analysis

All Plaintiffs have brought Title VII claims and claims under the parallel state anti-discrimination law, R.C. § 4112.02. Because the current-employee Plaintiffs and the

---

[46] *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014).
[47] *Est. of Barney v. PNC Bank, Nat. Ass'n*, 714 F.3d 920, 924 (6th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009)).
[48] *Id.* (quoting *Iqbal*, 566 U.S. at 677).
[49] *Id.* (quoting *Iqbal*, 566 U.S. at 678).
[50] *Kottmyer v. Maas*, 436 F.3d 684 (6th Cir. 2006).

- 12 -

Case No. 22-cv-2154
GWIN, J.

former-employee Plaintiffs allege different facts to support those claims, the Court analyzes each group's pleadings in turn.

### i.  Current-Employee Plaintiffs' Failure to State a Claim

Although Plaintiffs' Complaint appears to assert a general violation of Title VII, Title VII can include both failure-to-accommodate claims and religious discrimination claims. The employee Plaintiffs have failed to plead facts sufficient to state either claim. Because Ohio employment discrimination claims under R.C. § 4112.02 use the same standards as Title VII claims,[51] Plaintiffs likewise fail to state their R.C. § 4112.02 claims.

A religious accommodation claim requires a plaintiff to plead that "(1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflicts; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement."[52]

With different allegations required, a religious discrimination claim requires a plaintiff to plead "(1) that he was a member of a protected class, (2) that he experienced an adverse employment action, (3) that he was qualified for the position, and (4) that he was replaced by a person outside of the protected class or that he was treated differently than similarly situated employees."[53]

**Religious Accommodation**. At the motion to dismiss stage, the Court accepts as true the employee Plaintiffs' allegations that they held sincere religious objections to receiving the COVID-19 and/or influenza vaccines, and that all the Plaintiffs who remain employed

---

[51] *Yeager v. FirstEnergy Generation Corp.*, 777 F.3d 362, 363 (6th Cir. 2015) (noting that courts apply the same analysis to Title VII and R.C. § 4112 claims).
[52] *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007).
[53] *Id.* at 515.

Case No. 22-cv-2154
GWIN, J.

at MetroHealth informed MetroHealth of their religious objections to the vaccine mandate.

However, none of the employee Plaintiffs have pled any facts that plausibly establish that they have suffered discipline or discharge. That they have not been discharged is self-evident. But employee Plaintiffs have also not alleged that MetroHealth disciplined them for refusing vaccination.

None of the employee Plaintiffs allege being demoted, replaced, switched to different jobs, taken off of work shifts, or subjected to any other disciplinary action. Plaintiff 15 alleged that after her religious exemption request was initially denied, a manager told her that they would no longer schedule her for work.[54] But she did not allege being ultimately removed from work schedules. Plaintiff 36 alleged that she was put on a "performance improvement plan" around the time that she told her supervisor that she intended to request a religious exemption. But as a matter of law, "a negative performance evaluation does not constitute an adverse employment action, unless the evaluation has an adverse impact on an employee's wages or salary."[55] Plaintiff 36 did not allege any adverse impact on her wages or salary from the performance plan.

Several other employee Plaintiffs say they were approached by managers to discuss whether they would be fired or replaced if they did not comply with the vaccination policy, but none of them allege any of these encounters resulting in disciplinary actions being taken against them. Without allegations of actual disciplinary action, Plaintiffs' accommodation claims fail.

**Religious discrimination**. Similarly, the Court will accept as true that the employee

---

[54] Doc. 2 at PageID 35.
[55] *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007).

Case No. 22-cv-2154
GWIN, J.

Plaintiffs have pled prongs 1 and 3 of a Title VII religious discrimination claim: they have all alleged being members of a protected class, and the Court will reasonably infer from the facts that they were all qualified for their respective jobs. But again, the employee Plaintiffs fail to plausibly plead facts related to prong 2, namely whether they have been subjected to adverse employment actions.

> A materially adverse employment action is:
>
> [A] significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. Such a change must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.[56]

For the same reasons as discussed above, none of the employee Plaintiffs have pled facts that, if taken as true, plausibly allege any adverse employment actions. The fact that some Plaintiffs allege that they endured rude or spiteful comments from managers or coworkers does not suffice to state plausible adverse employment actions. As a matter of law, the employee Plaintiffs' allegations are all either too threadbare and conclusory (such as Plaintiff 22's vague allegation that she was "bullied" and "belittled"[57]) or else do not

---

[56] *Tepper*, 505 F.3d at 515.
[57] Doc. 2 at PageID 41. Plaintiff 11 likewise says in a conclusory fashion that she was subjected to "rude" comments. *Id.* at PageID 29.

Case No. 22-cv-2154
GWIN, J.

establish anything more than occasional rude comments.[58] "Title VII does not provide

protection from discriminatory behavior such as sporadic use of abusive language, … jokes,

and occasional teasing."[59]

The Court is also highly skeptical of whether the employee Plaintiffs have pled facts

supporting prong 4, replacement by persons outside of the protected class or treatment

different from that of similarly situated employees. Replacement has not been alleged at all,

so Plaintiffs must plead that they were treated differently than similarly situated employees.

They have tried to do so in two ways: by alleging they were treated differently than

coworkers who sought medical exemptions, and by alleging that they were treated

differently than vaccinated coworkers.

The employee Plaintiffs allege they were treated differently than coworkers who

sought health-related vaccine exemptions because those coworkers were granted

exemptions from the outset.  But health-related vaccine exemptions differ from religious

exemptions.  Different factors receive consideration and establishing a health-related

vaccine vulnerability differs from establishing a religious exemption.

Even accepting Plaintiffs' contention that some coworkers seeking medical

exemptions received exemptions sooner than Plaintiffs did, Plaintiffs were treated as

compliant with MetroHealth's vaccination policy for the entire time that their exemption

requests were pending; they received a grace period of 45 days after their requests were

denied during which they continued to be treated as compliant; and they were ultimately

---

[58] For example, Plaintiff 41 alleged that coworkers would murmur "tick-tock" as she passed by them. *Id.* at PageID 63. Plaintiff 44 said his colleagues joked about whether a doctor should "accidentally" bump into him with a vaccine. *Id.* at PageID 66.
[59] *Tepper*, 505 F.3d at 516 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Case No. 22-cv-2154
GWIN, J.

granted exemptions during that grace period, putting them not only functionally but officially in the exact same position as their coworkers who received medical exemptions.

Some of the employee Plaintiffs separately attempt to plead that they have been treated differently than their vaccinated coworkers because the vaccinated coworkers are not required to social distance and are permitted to eat unmasked in group environments such as the cafeteria or break rooms. Plaintiffs contend that regular testing and masking should have sufficed, and that Defendant's social distancing requirements amounted to impermissible disparate treatment.

But although Plaintiffs characterize Defendant's social distancing protocols as anti-religious discrimination, they fail to allege that only employees claiming the religious exemption were subjected to these protocols. Rather, the Complaint on its face states that all unvaccinated employees were required to stay masked and were barred from areas of congregation.[60] Thus, MetroHealth's social distancing protocols was based on vaccination status, not religion. Vaccination status is not a class to which Title VII protections apply.[61]

To the extent that some Plaintiffs plead that they were treated differently than unvaccinated patients, those allegations are irrelevant. Title VII looks at whether an employer treats protected and non-protected employees differently.

### ii. Former-Employee Plaintiffs' Failure to State a Claim

The former-employee Plaintiffs likewise bring Title VII religious accommodation and discrimination claims against Defendant MetroHealth, along with parallel state-law claims.

---

[60] *See, e.g.*, Doc. 2 at PageID 17; *id.* at PageID 65.

[61] Moreover, "Title VII does not restrict an employer to only those means of accommodation that are preferred by the employee." *Horvath v. City of Leander*, 946 F.3d 787, 791 (5th Cir. 2020), *as revised* (Jan. 13, 2020). The fact that Plaintiffs would have preferred different accommodations than the ones offered does not suffice to state a claim for disparate treatment.

Case No. 22-cv-2154
GWIN, J.

Although MetroHealth did not fire any of the former-employee Plaintiffs directly, Plaintiffs argue that they have pled the discipline-or-discharge element of their religious accommodation claims and/or the adverse-employment-action element of their religious discrimination claims by pleading that they were constructively discharged. The Court disagrees.

"To demonstrate a constructive discharge, Plaintiff must present evidence to show that 1) the employer [ ] deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit."[62] Alternatively, Plaintiffs can also plead constructive discharge if they show that they resigned when it was absolutely clear that their employer had decided to terminate them anyways.[63]

It is in no way obvious that a COVID-19 vaccination requirement creates an intolerable working condition as perceived by a reasonable person.  In January 2022, more than 13,000 Ohio citizens contracted COVID-19 each day, 4700 were hospitalized each day and over 100 Ohio citizens died each day.[64]  Hospitals operated at the pandemic epicenter.  "In Ohio, more than 94% of all hospitalizations and deaths since Jan. 1, 2021 have occurred among people who are not fully vaccinated."[65]

Each public hospital enjoys discretion when deciding what is necessary to keep other employees and the public safe in the hospital congregate setting. In health facilities and education facilities, vaccinations against measles, mumps, rubella, diphtheria, tetanus,

---

[62] *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir.2005)

[63] *Laster*, 746 F.3d at 728.

[64] Jake Zuckerman, *Ohio leads nation in COVID-19 deaths over last week*, OHIO CAPITAL JOURNAL (Jan. 28, 2022, 3:50 AM), https://ohiocapitaljournal.com/2022/01/28/ohio-leads-nation-in-covid-19-deaths-over-last-week/.

[65] *Id.*

Case No. 22-cv-2154
GWIN, J.

pertussis, varicella, meningitis, and influenza are common requirements.[66] Vaccination

protects not only the vaccinated persons but also those who encounter vaccinated people.

Reducing the frequency, severity, and duration of infections among employees through

vaccination also helps hospitals keep up the staffing they need in order to contend with an

overwhelming influx of patients during a pandemic.

Plaintiffs have a right to bodily integrity. They have the right to choose what risks they

will subject themselves and their families to.  But they do not have the right to require

MetroHealth to subject other employees and patients and the public to greater COVID-19

infection risks.

Under prong 1, the intolerable working conditions leading to constructive discharge

must be "even more egregious than the high standard for hostile work environment."  Like

the current-employee Plaintiffs, none of the former-employee Plaintiffs have pled any facts

that would suggest that they were subjected to conditions that meet or surpass the "high

standard for hostile work environment." At most, Plaintiff 8 recalled the embarrassment of

an instance in which her coworkers formed a betting pool over whether she would get the

vaccine.  While insensitive, this singular poor effort at humor does not plead that Plaintiff 8

experienced pervasively hostile treatment.

The remaining former-employee Plaintiffs made only threadbare and conclusory

references to hostility, if they made any at all, such as when Plaintiff 2 alluded to

MetroHealth "gaslighting" her, with no explanation of what she meant.

Against the backdrop of the COVID-19 pandemic, MetroHealth's vaccine requirement

did not create an intolerable working condition.

---

[66] *Klaassen v. Trustees of Indiana Univ.*, 7 F.4th 592, 593 (7th Cir. 2021)

Case No. 22-cv-2154
GWIN, J.

To state claims based on constructive discharge, the former-employee Plaintiffs also need to plead that MetroHealth intended to force Plaintiffs to quit. Allegations that are merely possible but not plausible fail as a matter of law.[67] Here, Plaintiffs say that MetroHealth intended to force them to quit by deliberately and painfully prolonging its process for evaluating their exemption requests and by denying the requests. Neither allegation rises above mere possibility to the level of plausibility.

The fact that Plaintiffs felt anxious while awaiting MetroHealth's decisions and wished that the decisions would come sooner does not suffice to show that MetroHealth intended to torment Plaintiffs into quitting. The Complaint itself states that MetroHealth maintained an official policy of treating Plaintiffs as compliant with vaccination requirements for the entire time that their requests were pending. The Complaint pleads no disciplinary or adverse employment actions taken against Plaintiffs by MetroHealth during that time. It also states on its face that MetroHealth explained that decisions took longer because MetroHealth did not anticipate the larger number of exemption requests that were sought.

Likewise, the former-employee Plaintiffs do not plausibly plead that MetroHealth denied their exemptions as a subterfuge to force them to quit. MetroHealth offered an extended grace period for Plaintiffs to get vaccinated and avert any threat to their employment. It then eliminated any threat to that employment when, during the grace period, it decided that an ebb in the severity of the pandemic allowed it to grant accommodations. Finally, seven of the nine former-employee Plaintiffs either did not submit an exemption request, did not wait for a decision from MetroHealth before

---

[67] *Iqbal*, 556 U.S. at 679.

- 20 -

Case No. 22-cv-2154
GWIN, J.

resigning, or left after being granted an exemption. Thus, they are barred from even attempting to plead constructive discharge based on being denied exemptions.

Alternatively, an employee can show constructive discharge if they resigned when it was clear that their employer intended to terminate them anyways.[68] Again, none of the former-employee Plaintiffs plead facts sufficient to allege that the "handwriting was on the wall" as to their employment.[69] As a matter of law, for the threat of termination to support a claim based on constructive discharge, that threat must be clear and imminent. "[T]he prospect of being fired at the conclusion of an extended process is not itself a constructive discharge."[70] "[A]n employee [does] not demonstrate that she was discharged constructively when she receive[s] notice of her employer's intent to commence a process that could lead to her discharge and the employer did not undermine the employee's position, perquisites, or dignity in the interim."[71]

Here, MetroHealth decided that it needed to enforce a vaccination requirement to protect its patients and its employees.  MetroHealth sought to enforce this vaccine requirement while losing as few employees as possible.  The Complaint does not allege that MetroHealth sought to terminate employees.  Instead, the Complaint alleges that MetroHealth early intended to enforce the vaccine requirement even though it knew that some employees would not accept the requirement.

Here, Plaintiffs 4–9 cannot have been on the brink of termination because they all admit that they resigned before they received an exemption decision from MetroHealth.

---

[68] *Laster*, 746 F.3d at 728.
[69] *Id.*
[70] *Wright v. Illinois Dep't of Child. & Fam. Servs.*, 798 F.3d 513, 530 (7th Cir. 2015) (citation omitted).
[71] *Id.* (citation omitted).

Case No. 22-cv-2154
GWIN, J.

(Indeed, Plaintiff 8 resigned without making any exemption request). Plaintiff 3 quit six

months after receiving an exemption and pleads no facts to show that he was under any

threat of termination at that time.  And although Plaintiffs 1 and 2 resigned after

MetroHealth denied their exemption requests, both left with a substantial amount of time

remaining on their grace period—i.e., before the conclusion of an extended discharge

process—and neither of them plead that they experienced any diminishment in their

positions or responsibilities in the interim. [72]

### C. Counts II through V: Injunctive Relief for U.S. and Ohio Constitutional Claims under 28 U.S.C. § 2201 and 42 U.S.C. § 1983

In Counts II through V of their Complaint, Plaintiffs assert that Defendant has

violated their federal Free Exercise of Religion rights and their state constitutional rights to

worship and to refuse medical treatment. So, they ask for declaratory or injunctive relief

under either 28 U.S.C. § 2201 or 42 U.S.C. § 1983 to prevent Defendant from violating

those rights again in the future.[73] But Plaintiffs fail to establish subject-matter jurisdiction

for these claims.

"While a plaintiff might have standing to seek damages or redress for past injuries,

that plaintiff must demonstrate separate standing when seeking declaratory or injunctive

relief."[74] "Previous exposure to illegal conduct, by itself and without a showing of

---

[72] Defendant separately argues that the Court lacks subject-matter jurisdiction over claims brought by Plaintiffs 4–9 and 46 because those Plaintiffs failed to exhaust their administrative remedies before suing. Title VII requires administrative exhaustion, but failure to exhaust is a violation of a party's procedural obligations, not a jurisdictional issue. *Fort Bend Cnty., Texas v. Davis*, 204 L. Ed. 2d 116, 139 S. Ct. 1843, 1851 (2019). Still, Plaintiffs do not dispute their failure to exhaust. Rather, they argue only that the Court should somehow find that Defendant forfeited its exhaustion defense by failing to raise it until now. As this is Defendant's first pre-answer motion, Plaintiff's forfeiture argument is unpersuasive. So, the Court **DISMISSES** Plaintiffs 4–9 and 46's claims also on failure to exhaust grounds.

[73] Doc. 2 at PageID 73–75.

[74] *Hightower v. City of Grand Rapids*, 256 F. Supp. 3d 742, 748 (W.D. Mich. 2017) (citing *Barber v. Miller*, 809 F.3d 840, 849 (6th Cir. 2015)).

Case No. 22-cv-2154
GWIN, J.

continuing and present adverse effects, does not establish a case or controversy for the purpose of seeking declaratory or injunctive relief."[75]

Here, the former-employee Plaintiffs' requests for prospective relief are moot. They are incapable of pleading continuing or future injury, as they no longer work for MetroHealth.[76]

Conversely, none of the current-employee Plaintiffs' claims are ripe. "Ripeness is a question of timing ... [which] dictates that courts should decide only existing, substantial controversies, not hypothetical questions or possibilities.... Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all."[77] "Unlike standing, in determining ripeness, the court's focus should be on the development of the facts and not on the parties themselves."[78]

Here, none of the employee Plaintiffs plead facts sufficient to show that their claims are ripe for injunctive relief. While some of the employee Plaintiffs have pled that MetroHealth has commenced its next annual round of processing flu exemption requests,[79] all of the employee Plaintiffs currently have exemptions and there are no facts—such as a worse-than-anticipated flu season or changes in hospital or federal vaccination policy—that suggest they will not qualify for exemptions again in the future.

---

[75] *Id.* (citing *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001)).

[76] *See Klaassen*, 24 F.4th at 640 (dismissing students' challenges to COVID-19 vaccination requirement as moot after students either received religious exemptions or withdrew from the university); *Harris v. Univ. of Massachusetts Lowell*, 43 F.4th 187, 192 (1st Cir. 2022) (dismissing student's Free Exercise claim for injunctive relief because she had graduated from the university that denied her a religious exemption to its COVID-19 vaccine mandate).

[77] *City Communications, Inc. v. City of Detroit*, 888 F.2d 1081, 1089 (6th Cir.1989).

[78] *Associated Gen. Contractors of Am., Cent. Ohio Div. v. City of Columbus*, 147 F. Supp. 2d 864, 870 (S.D. Ohio 2001) (citing *Hallandale Prof. Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 760 n. 3 (11th Cir.1991)).

[79] *See, e.g.*, Doc. 2 at PageID 32.

- 23 -

Case No. 22-cv-2154
GWIN, J.

Purely speculative anxiety about renewing one's exemption is not sufficient to establish a

live controversy.[80] "Should future developments threaten [Plaintiffs'] employment, [they]

may be able to invoke the district court's jurisdiction then. But [the Court] need not

speculate on a factual setting that has not yet come to pass."[81]

### III.     Conclusion

Plaintiffs either lack standing or have failed to state claims for violations of Title VII

or R.C. § 4112. They likewise lack standing to seek declaratory or injunctive relief based

on possible future violations of their rights under the U.S. and Ohio Constitutions. So, the

Court **GRANTS** Defendant's motion to dismiss as to all counts.

IT IS SO ORDERED.


Dated: July 12, 2023                                          *s/      James S. Gwin*
                                                             JAMES S. GWIN
                                                             UNITED STATES DISTRICT JUDGE

---

[80] *Bare*, 2023 WL 395026, at *2.
[81] *Id.*

- 24 -