**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **FRANK SAVEL,** | : | **CASE NO. 1:22-cv-02154** |
| | : | |
| **Plaintiff,** | : | **JUDGE JAMES GWIN** |
| | : | |
| **v.** | : | |
| | : | |
| **THE METROHEALTH SYSTEM,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

---

**MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF UNDISPUTED FACTS .................................................... 1

     A.     MetroHealth's COVID-19 Vaccination Requirement and Exemption Process ................................................................................................ 2

     B.     Savel's COVID-19 Vaccine Exemption Request, Denial on Undue Hardship Grounds, and Resignation ......................................................... 5

III.   LAW AND ARGUMENT ................................................................................ 8

     A.     Standard of Review ..................................................................................... 8

     B.     Plaintiff's Failure to Accommodate Claim Fails as a Matter of Law as He Cannot Establish a *Prima Facie* Case and, Further, the Exemption Constituted an Undue Hardship ................................................................ 8

         1.     Plaintiff Cannot Establish a *Prima Facie* Case as He Cannot Establish that MetroHealth Discriminated Against Him Because of His Religious Beliefs By Disciplining or Discharging Him, or that he was Constructively Discharged ............................................................. 9

         2.     Plaintiff's Request for a Religious Exemption from the COVID-19 Vaccine Requirement Constituted an Undue Hardship .......................... 13

     C.     Plaintiff's Disparate Treatment Claim Fails as a Matter of Law as He Cannot Establish a *Prima Facie* Case Because He Cannot Establish That He Suffered an Adverse Employment Action or That A Similarly Situated Person Who Was Outside the Protected Class Was Treated Better Than He Was ............................................................................................................. 17

IV.   CONCLUSION ................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Beuca v. Wash. State Univ.*, No. 2:23-CV-0069-TOR, 2023 U.S. Dist. LEXIS 88221 (E.D. Wash. May 19, 2023) ................................................................................................. 15

*Bushra v. Main Line Health, Inc.*, No. 23-1090, 2023 U.S. Dist. LEXIS 229965 (E.D. Penn. Dec. 28, 2023) ...................................................................................................... 15

*Carson v. Ford Motor Co.*, 413 F.App'x 820 (6th Cir. 2011) ....................................... 17

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ............................................................... 8

*Clayton v. Meijer, Inc.*, 281 F.3d 605 (6th Cir. 2002) .................................................. 18

*Dennison v. Bon Secours Charity Health Sys. Med. Grp., P.C.*, No. 22-CV-2929, 2023 U.S. Dist. LEXIS 84888 (S.D.N.Y. May 15, 2023) ................................................... 15

*Devore v. Univ. of Ky. Bd. of Trs.*, No. 5:22-cv-00186-GFVT-EBA, 2023 U.S. Dist. LEXIS 167239 (E.D. Ky. Sept. 18, 2023) ..................................................................... 15

*Does v. Hochyl*, 632 F.Supp.3d 120 (E.D.N.Y. 2022) .................................................... 15

*Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515 (6th Cir. 1975) ............... 14

*Edwards v. City of Cincinnati*, No. 1:22-cv-503, 2023 U.S. Dist. LEXIS 4748 (S.D. Ohio Jan. 10, 2023) ..................................................................................................... 10

*EEOC v. GEO Grp., Inc.*, 616 F.3d 265 (3d Cir. 2012) .................................................. 14

*Gardner-Alfred v. FRB of N.Y.*, No. 22-cv-1585, 2023 U.S. Dist. LEXIS 171012 (S.D.N.Y. Sept. 25, 2023) ............................................................................................. 9

*Goldblum v. Univ. of Cincinnati*, 62 F.4th 244 (6th Cir. 2023) .................................... 18

*Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629 (6th Cir. 2003) ................................. 10, 12

*Groff v. DeJoy*, 600 U.S. 447 (2023) ..................................................... 14, 15, 18

*Isensee v. Amplity, Inc.*, No. 3:22-cv-370, 2024 U.S. Dist. LEXIS 85982 (S.D. Ohio May 13, 2024) ............................................................................................................... 8

*Kirk v. Hockenberry*, No. 1:14-CV-713, 2016 U.S. Dist. LEXIS 11392 (S.D. Ohio Feb. 1, 2016) ........................................................................................................................... 10

*Laster v. City of Kalamazoo*, 746 F.3d 714 (6th Cir. 2014) ........................................ 10

*Makar v. Cleveland Clinic Found.,* No. 1:19CV1185, 2021 U.S. Dist. LEXIS 45784 (N.D. Ohio Mar. 11, 2021) ................................................................................................... 17

*Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992) .............................................. 18

*Passarella v. Aspirus, Inc.*, Nos. 22-cv-287; 22-cv-342; 22-cv-392, 2023 U.S. Dist. LEXIS 40958 (W.D. Wis. Mar. 9, 2023) ........................................................................ 9

*Rhoads v. Bd. of Educ. of Mad River Local Sch. Dist.*, 103 F.App'x 888 (6th Cir. 2004) ........... 10

*Robertson v. McKesson Corp.*, No. 2:23-cv-2334, 2023 U.S. Dist. LEXIS 141159 (S.D. Ohio Aug. 11, 2023) ................................................................................................ 13, 20

*Savel, et al. v. MetroHealth Sys.*, 6th Cir. No. 23-3672 (Mar. 20, 2024) ........................................ 1

*Speer v. Ucor LLC*, No. 3:22-cv-426, 2023 U.S. Dist. LEXIS 198889 (E.D. Tenn. Nov. 6, 2023) ................................................................................................................................... 9, 14

*Thompson v. Asante Health Sys.*, No. 1:23-cv-00486-CL, 2023 U.S. Dist. LEXIS 200693 (D. Or. Sept. 21, 2023) .................................................................................................... 18

*Tibbs v. Calvary United Methodist Church*, 505 F.App'x 508 (6th Cir. 2012) .......................... 17

*Together Emples. v. Mass Gen. Brigham Inc.*, 573 F.Supp. 412 (D. Mass. 2021) ..................... 16

*Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) ...................................................... 14

*Villareal v. Rocky Knoll Health Care Ctr.*, No. 21-CV-729, 2022 U.S. Dist. LEXIS 210267 (E.D. Wis. Nov. 21, 2022) ........................................................................................... 13

*Villareal v. Rocky Knoll Health Ctr.*, No. 21-CV-729, 2022 U.S. Dist. LEXIS 97364 (E.D. Wis. June 1, 2022) ...................................................................................................... 14

*Wise v. Children's Hosp. Med. Ctr. of Akron*, No. 5:22-CV-02092, 2024 U.S. Dist. LEXIS 119686 (N.D. Ohio July 9, 2024) ................................................................................ 15

**Statutes**

R.C. § 4112 ...................................................................................................................... passim

Title VII .......................................................................................................................... passim

**Rules**

Rule 56 ..................................................................................................................................... 8

## I.     INTRODUCTION

Plaintiff Frank Savel ("Plaintiff" or "Savel") was a registered nurse in the Medical Intensive Care Unit ("MICU") at Defendant The MetroHealth System ("Defendant" or "MetroHealth") until he resigned his employment in February 2022, effective March 4, 2022.

Savel and forty-five other MetroHealth employees filed a lawsuit against MetroHealth related to the denial of their COVID-19 religious exemption requests. Forty-four of the plaintiffs were dismissed as they were found to lack standing, leaving two remaining plaintiffs – Savel and Crockett – and two remaining claims under Title VII and Ohio Rev. Code § 4112: (1) failure to accommodate and (2) disparate treatment. (Order of Dismissal, ECF 23; *Savel, et al. v. MetroHealth Sys.*, 6th Cir. No. 23-3672 (Mar. 20, 2024); Compl., Counts I and VI, ECF 2.)[1] However, Crockett subsequently moved to dismiss her claims, which were dismissed effective July 9, 2024. (ECF 47.) Accordingly, Savel is the sole plaintiff remaining.

Savel's two claims survived appeal based on the plausibility standard as the dismissal was at the motion to dismiss stage, specifically leaving open the potential for dismissal "at a later phase of this litigation based on additional evidence." (*Savel, et al v. MetroHealth Sys.*, 6th Cir. No. 23-3672, p. 10.) These claims are ripe for dismissal.

## II.     STATEMENT OF UNDISPUTED FACTS

MetroHealth was founded in 1837 and is one of the largest health care providers in Northeast Ohio. (3rd Supp. Calabrese Decl., ¶3, attached hereto as Ex. A.[2]) MetroHealth currently operates four hospitals, four emergency departments, more than twenty health centers, and forty

---

[1] Plaintiffs' constitutional claims (Counts II, III, IV, and V of the Complaint) were previously dismissed by this Court and Plaintiffs did not challenge the dismissal of these claims on appeal. (Order of Dismissal, ECF 23; *Savel, et al. v. MetroHealth Sys.*, 6th Cir. No. 23-3672, p. 3 n 1.)

[2] *See also* Original Calabrese Decl., ECF 12-2; 1st Supp. Calabrese Decl., ECF 20-1, 2nd Supp. Calabrese Decl., ECF 22-1. Plaintiff Savel has not served any written discovery upon Defendant or requested any depositions in this matter.

additional sites throughout Cuyahoga County and Northeast Ohio. (*Id*.) MetroHealth employs nearly 9,000 persons to serve more than 300,000 patients, more than two-thirds of whom are uninsured or covered by Medicare or Medicaid, providing essential health care services and operating as the community's safety net hospital system. (*Id*. at ¶4.)

### A.  MetroHealth's COVID-19 Vaccination Requirement and Exemption Process

On August 26, 2021, MetroHealth announced that all employees would be required to be fully vaccinated against COVID-19 as a condition of employment. (Savel Dep., p. 75[3]; Original Calabrese Decl., ECF 12-2, ¶¶3-4; 8/26/2021 HR Announcements, Exs. C-D.) MetroHealth's decision to require vaccination against COVID-19 was based on science, guidance from public health authorities, and MetroHealth's desire to protect patients and employees from infection, and to reduce the risk of serious illness and hospitalizations. (3rd Supp. Calabrese Decl., Ex. A, ¶5.)

Initially, MetroHealth communicated that employees were required to provide proof of vaccination or have an approved medical or non-medical/religious exemption by October 30, 2021. (8/26/2021 HR Announcements, Exs. C-D.) However, in October 2021, MetroHealth informed employees that it planned to make determinations as to exemption requests by December 31, 2021. (Savel Dep., p. 88; Original Calabrese Decl., ECF 12-2, ¶5; 10/15/2021 CEO Announcement, Ex. E.) Employees who submitted an exemption request by the October 30, 2021 deadline were deemed compliant while MetroHealth reviewed the request, and were allowed to work while awaiting the determination as to their request, provided they followed all other required COVID-19 safety protocols and mitigation measures. (*Id.*)

In December 2021, MetroHealth informed employees that it would not be able to issue

---

[3] Relevant pages of Savel's deposition transcripts are attached hereto as Ex. B. The transcripts have also been filed. (ECF 54-1 and 54-2.)

determinations by the anticipated December 31, 2021 date due to constraints on operations from the COVID-19 surge at the time, as well as changes in guidance and requirements surrounding COVID-19 vaccination and the healthcare environment, and determinations would now be issued no earlier than January 31, 2022. (Savel Dep., pp. 97-98; Original Calabrese Decl., ECF 12-2, ¶6; 12/15/2021 Vaccination Exemption – Delay in Processing, Ex. F.)

MetroHealth did not issue "a blanket denial of all religious exemption requests" to its COVID-19 vaccination policy as Savel alleges (Compl. ¶33, ECF 2); rather, it engaged in an interactive process with employees who submitted non-medical/religious exemption requests and completed an individualized assessment to determine: (1) whether the individual employee had articulated a sincerely held non-medical/religious belief, and (2) whether it would constitute an undue burden to accommodate the individual employee's exemption request. (2nd Supp. Calabrese Decl., ECF 22-1, ¶3; 3rd Supp. Calabrese Decl., Ex. A, ¶6.) MetroHealth also engaged in an interactive process and completed individualized assessments for medical exemption requests. (3rd Supp. Calabrese Decl., Ex. A, ¶6.) MetroHealth established two committees to review all COVID-19 vaccine exemption requests: one non-medical/religious exemptions and one for medical exemptions, each of which was comprised of qualified MetroHealth professionals who carefully reviewed each exemption request individually. (3rd Supp. Calabrese Decl., Ex. A, ¶7.)

In January and February 2022, although COVID-19 positive cases were declining in Cuyahoga County, they still remained high, and positivity rates remained high at MetroHealth. (2nd Supp. Calabrese Decl., ECF 22-1, ¶4; 3rd Supp. Calabrese Decl., Ex. A, ¶8.) As a result, MetroHealth concluded that allowing unvaccinated employees who provided direct patient care, were in other in-person patient-facing roles, or whose job responsibilities otherwise required them to work on-site, posed serious and unnecessary safety risks to co-workers, patients, and others at

MetroHealth's hospitals and healthcare facilities. (2nd Supp. Calabrese Decl., ECF 22-1, ¶5; 3rd Supp. Calabrese Decl., Ex. A, ¶9.) Faced with these distressing realities, in February 2022, MetroHealth issued individualized decision letters to each employee who submitted a non-medical/religious exemption request informing them whether their request was approved (if they provided information supporting a sincerely held religious belief and their job duties could be performed 100% remotely) or denied (if they failed to provide information supporting a sincerely held religious belief and/or their job duties could not be performed 100% remotely). (2nd Supp. Calabrese Decl., ECF 22-1, ¶6.)

MetroHealth received 316 non-medical/religious exemption requests, 19 of which were initially approved, and 99 medical exemption requests, 12 of which were initially approved.[4] (3rd Supp. Calabrese Decl., Ex. A, ¶10.) MetroHealth informed the employees whose exemption requests were initially denied, regardless of whether their exemption requests were non-medical/religious or medical, that they had to get fully vaccinated and submit proof of vaccination within 45 days of the date the letter was issued, and also welcomed these employees to explore job vacancies at MetroHealth that were fully remote, providing the website to review the current vacancies and the Talent Acquisition email address for any questions about the current vacancies. (Savel Dep., pp. 99-100; Original Calabrese Decl., ECF 12-2, ¶7, and Ex. 1-E thereto; 3rd Supp. Calabrese Decl., Ex. A, ¶11.)

Thereafter, MetroHealth continued to monitor COVID-19 cases in Cuyahoga County and within MetroHealth. (2nd Supp. Calabrese Decl., ECF 22-1, ¶7; 3rd Supp. Calabrese Decl., Ex. A, ¶12.) By mid-March 2022, MetroHealth felt that COVID-19 cases in Cuyahoga County and within

---

[4] Additionally, MetroHealth approved some vaccination deferments in connection with medical exemption requests due to existing pregnancy/breastfeeding status, medical treatment, or to receive further assessment from an allergy or immunology specialist on alleged contraindication. (*Id.*)

MetroHealth had declined to a level such that it could now reasonably accommodate unvaccinated employees whose essential functions could not be performed 100% remotely so long as they followed all other applicable COVID-19 safety precautions, and announced this to its employee population on March 15, 2022. (Original Calabrese Decl. ECF 12-2, ¶9; 2nd Supp. Calabrese Decl., ECF 22-1, ¶7; 3rd Supp. Calabrese Decl., Ex. A, ¶¶12-14; 3/15/2022 COVID Medical And Non-Medical Exemption Announcement, Ex. G.)

**B.     Savel's COVID-19 Vaccine Exemption Request, Denial on Undue Hardship Grounds, and Resignation**

Savel was a registered nurse at MetroHealth's main campus in the MICU and he worked on the "front lines" during the COVID-19 pandemic and had direct patient contact. (Savel Dep., pp. 42-43.) On September 2, 2021, Savel requested a religious exemption from MetroHealth's COVID-19 vaccine requirement. (Savel Dep., p. 77; 9/2/2021 Vaccine Exemption Request, Ex. H.) Savel contended that he believes in the "dignity and sacredness of human life from conception until natural death" and it is against his religious beliefs to receive a vaccine that was developed through the use of fetal stem cell lines obtained through elective abortions. (*Id.*) In December 2021, MetroHealth requested additional information from Savel about his religious exemption request, to which he responded on December 8, 2021 and January 21, 2022. (Savel Dep., pp. 92-93; 12/6/2021 Request for Additional Information, Ex. I; 12/8/2021 and 1/21/2022 Response to Request for Additional Information, Ex. J.)

Given that his position required direct patient contact and could not be performed 100% remotely, on February 7, 2022, MetroHealth informed Savel of its denial of his exemption request. (Savel Dep., pp. 99-100; 2/7/2022 Vaccination Exemption Request Response, Ex. K.) Although MetroHealth welcomed Savel to explore job vacancies at MetroHealth that could be performed fully remote, he initially testified that he did not consult the website or send any emails to the email

address MetroHealth identified as a means for exploring fully remote options, but subsequently changed his testimony during the continuation of his deposition[5] to claim that he "thought he looked at the postings" the night of February 8th[6] but acknowledged that he "didn't look that long" and, further, did not consult anyone at MetroHealth about remote options. (Savel Dep., pp. 126-127, 164, 224-225.)

Within a day of receiving the February 7th exemption decision, he applied for and scheduled an interview for a position at University Hospitals. (Savel Dep., pp. 111-113, 139, 217-218; 2/8/2022 Email Re: Interview, Ex. L.) And, by February 16, 2022, he was offered and accepted a comparable position at University Hospitals as a registered nurse in its MICU, *i.e.*, the same position he held at MetroHealth, just three miles from his home, which is 24 miles closer to his home than MetroHealth, with a starting rate of pay of $40.00/hour,[7] plus a $6,000 signing bonus. (Savel Dep., pp. 111-113, 139, 218-220; 2/16/2022 Offer Letter and Email Acceptance, Ex. M.)

Savel immediately informed his manager at MetroHealth of his decision to leave for another position and continued to work at MetroHealth for two weeks through March 4, 2022, choosing to take a few weeks off and then beginning his employment at University Hospitals on March 28, 2022. (Savel Dep., pp. 106, 114-117, 219-220.) At the time Savel accepted the position at University Hospitals, he knew that his counsel planned to seek injunctive relief to prevent MetroHealth from taking any adverse action against employees whose religious exemption requests were denied, including himself, which it ultimately never did as MetroHealth

---

[5] Notably, Savel did not record this change on the errata sheet associated with the first day of his deposition. (*See* errata sheet, ECF 54-1, PageID #3639.)

[6] Notably, prior to the night of February 8th, Savel had already applied for an accepted an invitation for an interview with University Hospitals. (Savel Dep., pp. 217-218; 2/8/2022 Email Re: Interview, Ex. L.)

[7] Savel's rate of pay at the time of his resignation from MetroHealth was $39.64/hour. (Savel Dep., p. 45.) At University Hospitals, Savel also receives a shift differential on average of $6.50/hour in addition to his base pay rate. (Savel Dep,. p. 237-239.)

subsequently allowed exemptions that had been initially denied. (Savel Dep., pp. 228-230, 259-261; 2nd Supp. Calabrese Decl., ECF 22-1, ¶7; 3rd Supp. Calabrese Decl., Ex. A, ¶12.)

In connection with his decision to leave MetroHealth, Savel inquired about his accrued but unused vacation and sick time. (Savel Dep., pp. 117-119.) MetroHealth informed him that he would be paid out the accrued, unused vacation, and that there were two options with regard to the sick time under MetroHealth policy[8]: (1) it would be frozen and potentially available for use if he returned to a public employer in the future; or (2) if he retired from the Ohio Public Employees Retirement System (OPERS) and from MetroHealth, he would be eligible for ½ of the number of accrued, unused sick hours, up to a maximum of 800 hours. (Savel Dep., pp. 123-124.) Instead of electing to freeze the sick time, on March 9, 2022, Savel knowingly made the decision to retire from OPERS at the age of 55 with a reduced monthly benefit. (Savel Dep., pp. 124, 156, 163.) He was eligible to withdraw his OPERS retirement application within 30 days of receipt of the first monthly payment received, *i.e.*, within 30 days of April 1, 2022, if he desired to change his effective retirement date or to return to an OPERS covered employer to accrue additional service credit and retire later. (Savel Dep., pp. 132, 166; 3/10/2022 OPERS Letter, Ex. N.)

In mid-March 2022, Savel's former MetroHealth co-workers threw him a retirement party, at which time, they informed him that MetroHealth was now going to allow exemption requests for those whose requests were initially denied on grounds that their positions could not be performed 100% remotely. (Savel Dep., pp. 127-130.) Despite learning of this prior to beginning employment at University Hospitals and prior to the deadline to withdraw his OPERS retirement application, Savel did not contact anyone at MetroHealth to inquire about returning to his position

---

[8] Neither Federal law nor Ohio law require MetroHealth to payout unused sick time upon separation; rather, sick time payout is a matter of policy absent a controlling employment agreement or collective bargaining agreement, neither of which apply to Savel.

even though his manager had informed him that "she would be happy to see [him] back" and, further, Savel did not seek to withdraw his OPERS retirement application. (Savel Dep., pp. 127-130, 132, 167-168, 233-234; Savel 6/6/2022 Email to OCRC, Ex. O.)

## III.  LAW AND ARGUMENT

### A.  Standard of Review

The Supreme Court has emphasized the importance of the summary judgment procedure under Rule 56 and supports the dismissal of claims where a plaintiff cannot establish the essential elements of his claims and there are "no genuine issue as to any material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). "[T]he burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Savel alleges that MetroHealth failed to accommodate his religious beliefs and treated him differently because of his religious beliefs in violation of Title VII and R.C. § 4112[9] when it denied his request for a religious exemption to its COVID-19 vaccine requirement. (Compl., Counts I and IV.) Savel's failure to accommodate and disparate treatment religious discrimination claims fail as a matter of law.

### B.  Plaintiff's Failure to Accommodate Claim Fails as a Matter of Law as He Cannot Establish a *Prima Facie* Case and, Further, the Exemption Constituted an Undue Hardship

To state a *prima facie* failure to accommodate claim, Savel must establish that: (1) he holds a sincere religious belief that conflicted with an employment requirement;[10] (2) he informed his

---

[9] Federal caselaw interpreting Title VII is generally applicable to cases involving violations of R.C. § 4112. *Isensee v. Amplity, Inc.*, No. 3:22-cv-370, 2024 U.S. Dist. LEXIS 85982, at *8 (S.D. Ohio May 13, 2024). As such, the analysis herein applies to Savel's claims insofar as they are asserted under Title VII and R.C. § 4112.

[10] For purposes of this Motion only, MetroHealth assumes Savel can establish the first and second elements of his failure to accommodate claim; however, reserves the right to contest the first element if the claim is not dismissed on summary judgment as Savel acted inconsistently with his claimed belief insofar as he contends that he is opposed to

employer of the conflict; and (3) his employer discriminated against him because of his religious beliefs by disciplining or discharging him. *See Reed v. Int'l Union*, 569 F.3d 576, 580 (6th Cir. 2009); *Bolden v. Lowes Home Ctrs., LLC*, 783 F.App'x 589, 597 (6th Cir. 2019). Liability is precluded where providing the requested religious exemption would impose an "undue hardship" on the employer. *See* 42 U.S.C. § 2000e(j); R.C. § 4112.

Savel cannot establish a *prima facie* failure to accommodate religious discrimination claim as he cannot establish that MetroHealth discriminated against him because of his religious beliefs by disciplining or discharging him, or that he was constructively discharged and, further, his requested exemption constituted an undue hardship.

### 1. Plaintiff Cannot Establish a *Prima Facie* Case as He Cannot Establish that MetroHealth Discriminated Against Him Because of His Religious Beliefs By Disciplining or Discharging Him, or that he was Constructively Discharged

Savel's failure to accommodate claim fails as a matter of law because he cannot establish that MetroHealth discriminated against him because of his religious beliefs by disciplining or discharging him. Savel was not disciplined or discharged; rather, despite knowing that his counsel planned to seek injunctive relief to prevent MetroHealth from taking any adverse action against

---

obtaining the COVID-19 vaccine on grounds that it was developed, produced, or tested using fetal stem cell lines obtained from aborted fetuses, but yet has taken many medications during the relevant timeframe, that were also developed, produced, or tested in the same fashion – he just chose not to research them. (Savel Dep., pp. 22, 81-83, 85; 12/6/2021 Request for Additional Information, Ex. I, p. 4.) A factfinder must determine "whether the line drawn by the plaintiff between conduct consistent and inconsistent with her or his religious beliefs reflects an honest conviction." *See Speer v. Ucor LLC*, No. 3:22-cv-426, 2023 U.S. Dist. LEXIS 198889, at *18 (E.D. Tenn. Nov. 6, 2023); *Gardner-Alfred v. FRB of N.Y.*, No. 22-cv-1585, 2023 U.S. Dist. LEXIS 171012, at *56 (S.D.N.Y. Sept. 25, 2023) (dismissing the plaintiff's religious discrimination claim because the plaintiff acted "in a manner inconsistent with her claimed religious views" when she took medications "without first checking whether they contain or were made or manufactured with aborted fetal cell lines" and failed to inquire about the same). Although MetroHealth stated in its February 7, 2022 Vaccine Exemption Request Response that "[t]he information [Savel] provided established basis for an exemption," but denied the exemption request on undue burden grounds, MetroHealth is not foreclosed from challenging the sincerity of Savel's belief based upon facts learned during the course of this litigation. *See, e.g., Passarella v. Aspirus, Inc.*, Nos. 22-cv-287; 22-cv-342; 22-cv-392, 2023 U.S. Dist. LEXIS 40958, at *17 (W.D. Wis. Mar. 9, 2023) (granting a COVID-19 vaccine exemption request in plaintiff's capacity as a student was "not a judicial admission that her beliefs are religious for the purposes of a lawsuit under Title VII.")

employees whose religious exemption requests were denied, including himself, Savel chose to secure alternative employment and resigned his employment at MetroHealth providing a two week notice period. (Savel Dep., pp. 106, 114-117, 228-230, 259-261.) Resignations are generally presumed to be voluntary, absent constructive discharge. *Kirk v. Hockenberry*, No. 1:14-CV-713, 2016 U.S. Dist. LEXIS 11392, at *14 (S.D. Ohio Feb. 1, 2016) (citing *Rhoads v. Bd. of Educ. of Mad River Local Sch. Dist.*, 103 F.App'x 888, 895 (6th Cir. 2004)).

Savel cannot establish constructive discharge. A constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation. *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014). This requires a showing that: (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; and (2) the employer did so with the intention of forcing them to quit. *See Laster*, 746 F.3d 728 (citation omitted); *Edwards v. City of Cincinnati*, No. 1:22-cv-503, 2023 U.S. Dist. LEXIS 4748, at *10 (S.D. Ohio Jan. 10, 2023); *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629 (6th Cir. 2003). Alternatively, Savel must show that he resigned when it was absolutely clear that termination was imminent. *See Laster*, 746 F.3d at 727; *Goldmeier*, 337 F.3d at 636. Under either standard, the threshold to prove constructive discharge is quite high, and Savel cannot meet it.

Savel cannot establish that he was subjected to intolerable working conditions, as perceived by a reasonable person. With respect to his working conditions, Savel contended that MetroHealth "role[d] 24/7 video loops berating the unvaccinated." (Savel Dep., pp. 227-228; Savel 6/6/2022 Email to OCRC, Ex. O.) However, he testified that the word "berated" was not, in fact, accurate and was too harsh; rather, MetroHealth showed videos supporting the efficacy of the vaccine, none of which had any reference to religion whatsoever. (Savel Dep., pp. 227-228.) Moreover, Savel

10

continued working at MetroHealth for several weeks after securing comparable alternative employment and providing notice of his resignation. (Savel Dep., pp. 106, 114-117.) It is antithetical for an employee alleging that their employer deliberately created intolerable working conditions to extend their employment out of courtesy for the employer.

Savel also cannot establish that MetroHealth deliberately created intolerable working conditions with the intention of forcing him to quit or that it was absolutely clear that termination was imminent. To the contrary, the undisputed evidence establishes that MetroHealth asked those whose non-medical/religious exemption requests were initially denied, as well as those whose medical exemption requests were initially denied, to get vaccinated for safety-related reasons and welcomed them to explore positions that could be performed fully remote at MetroHealth for which they would not need to be vaccinated. (2/7/2022 Vaccination Exemption Request Response, Ex. K; 3rd Supp. Calabrese Decl., Ex. A, ¶¶5, 9, 11.) If MetroHealth were deliberately creating intolerable working conditions or termination were "imminent," MetroHealth would not have welcomed these employees to pursue fully remote options. Regardless, Savel initially testified that he did not consult the website or send any emails to the email address MetroHealth identified as a means for exploring fully remote options, and even though he subsequently changed his testimony to claim that he "thought that [he] looked at the postings" the night of February 8th," *i.e.*, <u>after</u> he had already applied to and accepted an interview with University Hospitals,[11] acknowledges that he "didn't look that long" and, further, did not consult anyone at MetroHealth about remote options. (Savel Dep., pp. 126-127, 164, 224-225; 2/8/2022 Email Re Interview, Ex. L.)

On February 8, 2022, <u>just one day into the 45-day period to either get vaccinated or to</u>

---

[11] Notably, prior to the night of February 8th, Savel had already applied for an accepted an invitation for an interview with University Hospitals. (Savel Dep., p. 217-218; 2/8/2022 Email Re Interview, Ex. L.)

explore fully remote positions at MetroHealth, *i.e.*, well before there would have been the first actual conflict between his alleged religious belief and MetroHealth's vaccine requirement, Savel had already begun the process to find alternative work. (Savel Dep., pp. 111-113, 139, 217-218; 2/8/2022 Email Re: Interview, Ex. L.) Savel's conduct is akin to that of the plaintiffs in *Goldmeier v. Allstate Ins. Co.* in which the Sixth Circuit found that the circumstances were insufficient to establish constructive discharge where the plaintiffs "continued to work for their employer until both of them had found new employment and then resigned fifty-three days before there would have been the first actual conflict between their religious and employment requirements." *Goldmeier*, 337 F.3d at 636.

Moreover, on February 16, 2022, when Savel accepted the position at University Hospitals, he already knew that his counsel planned to seek injunctive relief to prevent MetroHealth from taking any adverse action against employees whose religious exemption requests were denied, including himself. (Savel Dep., pp. 228-230, 259-261.) Prior to his counsel doing so, by mid-March 2022, MetroHealth felt that COVID-19 cases in Cuyahoga County and within MetroHealth had declined to a level such that it could then reasonably accommodate unvaccinated employees whose essential functions could not be performed 100% remotely so long as they followed all other applicable COVID-19 safety precautions. (3rd Supp. Calabrese Decl., Ex. A, ¶¶12-14.) Thus, Savel cannot establish that he resigned when it was absolutely clear that termination was imminent.

Furthermore, the undisputed evidence establishes that the majority of other employees in the same or similar circumstances to Savel, *i.e.*, those whose non-medical/religious exemption requests were initially denied, elected to continue employment at MetroHealth. (3rd Supp. Calabrese Decl., Ex. A, ¶15.) These employees were in the same "shoes" as Savel and, unlike him, did not feel compelled to resign, establishing that the working conditions were not intolerable as

perceived by a reasonable person and that it was not absolutely clear that termination was imminent. Accordingly, Savel cannot establish that he was constructively discharged.

Finally, even if the Court were to find that Savel was disciplined, discharged, or constructively discharged, the undisputed evidence establishes that any action was based upon safety concerns and vaccination status, not religion. Savel himself acknowledges that those whose exemptions were denied were told that "[they] are a threat to the health not just of ourselves, but [their] coworkers, and the population at large, due to [their] unvaccinated status."  (Savel Dep., p. 226.) "Vaccination status is not a class to which Title VII protections apply." *Robertson v. McKesson Corp.*, No. 2:23-cv-2334, 2023 U.S. Dist. LEXIS 141159, *18 (S.D. Ohio Aug. 11, 2023) (citation omitted), Report and Recommendation adopted and *aff'd* in 2023 U.S. Dist. LEXIS 188996 (S.D. Ohio Oct. 20, 2023). The lack of any evidence of any action taken against him because of his religious beliefs is fatal to his claims.

For the foregoing reasons, Savel's failure to accommodate claim fails as a matter of law and should be dismissed.

>           **2.**     **Plaintiff's Request for a Religious Exemption from the COVID-19 Vaccine Requirement Constituted an Undue Hardship**

Even if Savel could establish a *prima facie* failure to accommodate claim (which he cannot for the foregoing reasons), this claim still fails as a matter of law because granting him an exemption from the COVID-19 vaccine requirement would have caused MetroHealth and the patient population that it serves to suffer an undue hardship during the relevant time period. A court may assess an employer's defense of undue hardship as a matter of law where "the proposed accommodation would either cause or increase safety risks or the risk of legal liability." *Villareal v. Rocky Knoll Health Care Ctr.*, No. 21-CV-729, 2022 U.S. Dist. LEXIS 210267, at *18 (E.D. Wis. Nov. 21, 2022) (granting summary judgment to the defendant health care center on undue

hardship grounds).

Courts have consistently held that employers have a strong interest in preventing the spread of communicable diseases, including COVID-19, particularly in the healthcare context. *See Villareal v. Rocky Knoll Health Ctr.*, No. 21-CV-729, 2022 U.S. Dist. LEXIS 97364, at *10-11 (E.D. Wis. June 1, 2022) (collecting cases). "[S]afety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on the employer's business. Title VII does not require that safety be subordinated to the religious beliefs of employees." *Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515, 521 (6th Cir. 1975); *see also Speer v. Ucor LLC*, No. 3:22-cv-426, 2023 U.S. Dist. LEXIS 198889, at *20 (E.D. Tenn. Nov. 6, 2023) (citing *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2012) ("A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship.").

At the time MetroHealth made its initial determinations as to non-medical/religious exemption requests, the undue hardship defense to providing a religious accommodation under Title VII was defined by the Supreme Court as requiring a showing that the proposed accommodation in a particular case posed "more than a *de minimis*" cost or burden. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977). Although this standard was later modified in *Groff v. DeJoy*, 600 U.S. 447 (2023), the Tile VII undue burden standard is still lower than the undue hardship standard under the Americans with Disabilities Act ("ADA"), and the Supreme Court specifically declined to incorporate ADA case law and its higher standard into the Title VII context. *Id*. at 471. Rather, in *Groff*, the Supreme Court held that when examining undue hardship, a court must take "into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost

14

of [an] employer.'" *Id.* at 470-71.

Courts across the country, both pre- and post-*Groff*, have found that allowing unvaccinated employees to continue to work in a healthcare setting with vulnerable patients constitutes an undue hardship. *See, e.g., Wise v. Children's Hosp. Med. Ctr. of Akron*, No. 5:22-CV-02092, 2024 U.S. Dist. LEXIS 119686, at *6 (N.D. Ohio July 9, 2024) (granting summary judgment to the hospital because allowing plaintiff to come to work "while remaining unvaccinated and untested creates a heightened health risk that constitutes an undue hardship."); *Bushra v. Main Line Health, Inc.*, No. 23-1090, 2023 U.S. Dist. LEXIS 229965, at *20 (E.D. Penn. Dec. 28, 2023) (granting summary judgment because allowing a physician to continue working in the emergency room would constitute an undue hardship under *Groff* as he had "frequent and direct contact with patients and staff"); *Devore v. Univ. of Ky. Bd. of Trs.*, No. 5:22-cv-00186-GFVT-EBA, 2023 U.S. Dist. LEXIS 167239 (E.D. Ky. Sept. 18, 2023) (granting summary judgment to the university because it would face undue hardship under *Groff* where an administrator, whose position required her to work on-site, sought to be exempted from COVID-19 vaccination and testing due to her religious beliefs); *Beuca v. Wash. State Univ.*, No. 2:23-CV-0069-TOR, 2023 U.S. Dist. LEXIS 88221, at *7-8 (E.D. Wash. May 19, 2023) (dismissing plaintiff's claims and agreeing that "having unvaccinated internal medicine physicians would have imposed an undue hardship because it would have increased the risk of exposure to COVID-19 to patients and other healthcare workers"); *Dennison v. Bon Secours Charity Health Sys. Med. Grp., P.C.*, No. 22-CV-2929, 2023 U.S. Dist. LEXIS 84888, at *15 n.7 (S.D.N.Y. May 15, 2023) (dismissing plaintiff's claims, in part, due to the "obvious hardship associated with the increased health and safety risk posed to other employees and patients by allowing Plaintiffs to remain unvaccinated" against COVID-19 while working); *Does v. Hochyl*, 632 F.Supp.3d 120, 145 (E.D.N.Y. 2022) (dismissing plaintiff's claims, in part,

because "exempting the plaintiffs from the vaccine requirement would expose vulnerable patients…as well as other healthcare workers to the COVID-19 virus, which is obviously a significant hardship.").

In January and February 2022, although the number of positive COVID-19 cases were declining in Cuyahoga County, they still remained high, and positivity rates remained high at MetroHealth. (Supp. Calabrese Decl., ECF 22-1, ¶4; 3rd Supp. Calabrese Decl., Ex. A, ¶8.) As a result, MetroHealth concluded that allowing unvaccinated employees who provided direct patient care, were in other in-person patient-facing roles, or whose job responsibilities otherwise required them to work on-site, posed serious and unnecessary safety risks to co-workers, patients, and others at MetroHealth's hospitals and healthcare facilities. (2nd Supp. Calabrese Decl., ECF 22-1, ¶5; 3rd Supp. Calabrese Decl., Ex. A, ¶9.)

Thereafter, MetroHealth continued to monitor COVID-19 cases in Cuyahoga County and within MetroHealth, and by mid-March, concluded that there was an acceptable decline in cases such that it could now reasonably accommodate unvaccinated employees whose essential functions could not be performed 100% remotely without creating an undue hardship so long as those unvaccinated employees followed all other applicable COVID-19 safety precautions. (2nd Supp. Calabrese Decl., ECF 22-1, ¶7; 3rd Supp. Calabrese Decl., Ex. A, ¶12.) Doing so was well within MetroHealth's discretion and supported by the data it relied upon (3rd Supp. Calabrese Decl., Ex. A, ¶¶13-14), and a court should not second-guess MetroHealth's judgment in matters related to the safety of its employees, patients, and visitors. *See Together Emples. v. Mass Gen. Brigham Inc.*, 573 F.Supp. 412, 433 (D. Mass. 2021).

To the extent that Savel disagrees with MetroHealth's assessment of the COVID-19 data, his subjective belief that it did not support MetroHealth's decision to deny COVID-19 exemption

requests does not establish discriminatory animus and is insufficient to defeat summary judgment. *See Tibbs v. Calvary United Methodist Church*, 505 F.App'x 508, 514 (6th Cir. 2012) (noting that "arguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest*") (citation omitted); *Carson v. Ford Motor Co*., 413 F.App'x 820, 824 (6th Cir. 2011) ("[The plaintiff's] subjective belief that [his employer's] proffered reason is false, …is not sufficient to withstand summary judgment").

The foregoing provides an additional basis for dismissal of Savel's failure to accommodate claim.

### C.   Plaintiff's Disparate Treatment Claim Fails as a Matter of Law as He Cannot Establish a *Prima Facie* Case Because He Cannot Establish That He Suffered an Adverse Employment Action or That A Similarly Situated Person Who Was Outside the Protected Class Was Treated Better Than He Was

To the extent that Savel contends that MetroHealth treated him differently based on religion by "issu[ing] a blanket denial of all religious exemption requests" while granting medical exemption requests (Compl., ¶¶ 33, 38), his contention is not supported by any evidence and, further, is not a similarly situated comparison as required under the law.

To establish a *prima facie* case of disparate treatment, Savel must establish: (1) his membership in a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for his position; and (4) that a person who was outside the protected class and similarly situated to them in all relevant respects was treated better than he was. *Makar v. Cleveland Clinic Found.,* No. 1:19CV1185, 2021 U.S. Dist. LEXIS 45784, *9-10 (N.D. Ohio Mar. 11, 2021). Savel cannot do so.

First, as set forth above, Savel cannot establish that he suffered an adverse employment action or was constructively discharged. (*See supra* Section III(B)(1).) Second, Savel cannot

17

establish that others outside his protected class and similarly situated to him in all relevant respects were treated better than he was.

A disparate treatment claim is not made by comparing individuals in a protected class with those in a different protected class under a separate statute with different standards. To satisfy the "similarly situated" requirement, Savel and his comparator(s) must share the same supervisor, be subject to the same standards, and engage in the same conduct. *Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 255 (6th Cir. 2023). Further, there must be a lack of "differentiating or mitigating circumstances that would distinguish [the comparators'] conduct or the employer's treatment of them for it." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Savel is not similarly situated to individuals who submitted medical exemption requests. Medical exemption requests and religious exemption requests are fundamentally different. Medical exemption requests typically relate to situations where the vaccine itself would cause the requester adverse health conditions or physical harm (negating the underlying reason for the vaccine in the first instance, *i.e.*, promoting public health), whereas religious exemption requests typically do not relate to a situation where the requestor's health would be compromised and also do not further the promotion of public health. *See Thompson v. Asante Health Sys.*, No. 1:23-cv-00486-CL, 2023 U.S. Dist. LEXIS 200693, *19-20 (D. Or. Sept. 21, 2023), Report and Recommendation adopted and *aff'd* in 2023 U.S. Dist. LEXIS 199640 (D. Or. Nov. 7, 2023) (dismissing disparate treatment claims where the plaintiffs who sought religious exemptions to a COVID-19 vaccine mandate alleged that they were similarly situated to employees who sought medical exemptions, citing *Groff v. DeJoy* for the proposition that "[t]he standards by which employers are required to accommodate religious requests and medical requests for exemptions to

workplace requirements are not the same," namely "in the religious context, an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of the particular business" and "conflating this standard with the medical standard and ADA caselaw would 'go too far.'").

Even if a comparison to medical exemption requests were proper (which it is not for the foregoing reasons), there is no admissible evidence establishing that those who submitted medical exemption requests were treated more favorably than Savel. The undisputed evidence establishes that MetroHealth received 316 non-medical/religious exemption requests, 19 of which it initially approved, and 99 medical exemption requests, 12 of which it initially approved. (3rd Supp. Calabrese Decl., Ex. A, ¶10.) Moreover, MetroHealth informed the employees whose exemption requests were denied, regardless of whether their exemption requests were non-medical/religious or medical, that they had to get fully vaccinated and submit proof of vaccination within 45 days, and also welcomed these employees to explore job vacancies at MetroHealth that were fully remote. (Id. at ¶11.) MetroHealth's decision to require vaccination against COVID-19 and denial of exemption requests for those who could not perform their positions 100% remotely was based on MetroHealth's desire to protect patients and employees from infection, to reduce the risk of serious illness and hospitalization, and as a result of what it concluded were, at that time, unacceptable safety-related risks associated with unvaccinated employees working in direct patient care, in other in-person patient-facing roles, or whose job responsibilities otherwise required them to work on-site, not religion.  (Id. at ¶¶5, 9.)

To the extent Savel contends he was treated differently from his co-workers insofar as other COVID-19 safety protocols were relaxed for the employees who were vaccinated (Compl., ¶¶11-14), any such differential treatment was based on vaccination status, not religion, and as set forth

above, "[v]accination status is not a class to which Title VII protections apply." *Robertson*, 2023 U.S. Dist. LEXIS 141159, *18.

For the foregoing reasons, Savel's disparate treatment claim fails as a matter of law and should be dismissed.

## IV.    <u>CONCLUSION</u>

There is no evidence that MetroHealth took any action against or treated Savel differently because of his religious beliefs. Rather, the undisputed evidence establishes that MetroHealth took the time to evaluate exemption requests, engage in the interactive process, and make informed decisions based upon on science, guidance from public health authorities, and its desire to protect employees and patients from infection, and to reduce the risk of serious illness and hospitalizations. Accordingly, Savel's failure to accommodate and disparate treatment religious discrimination claims under Title VII and R.C. § 4112 fail as a matter of law and should be dismissed.

<div style="margin-left: 40%;">

Respectfully submitted,

ZASHIN & RICH CO., L.P.A.

*/s/ Natalie M. Stevens*
Stephen S. Zashin (0064557)
ssz@zrlaw.com
Ami J. Patel (0078201)
ajp@zrlaw.com
Natalie M. Stevens (0079963)
nms@zrlaw.com
Rebecca G. Singer-Miller (0103774)
rsm@zrlaw.com
950 Main Avenue, 4th Floor
Cleveland, OH 44113
Telephone: (216) 696-4441
Facsimile: (216) 696-1618

*Attorneys for Defendant The MetroHealth System*

</div>

## <u>COMPLIANCE WITH LOCAL RULE 7.1</u>

The undersigned certifies that the Court has assigned this case to the standard track, and that the foregoing *Memorandum in Support of Defendant's Motion for Summary Judgment*, exclusive of cover page, signature blocks and Tables of Contents and Authorities, adheres to the 20-page limitation of Local Rule 7.1(f).

*/s/ Natalie M. Stevens*
Stephen S. Zashin (0064557)
ssz@zrlaw.com
Natalie M. Stevens (0079963)
nms@zrlaw.com
Ami J. Patel (0078201
ajp@zrlaw.com
Rebecca G. Singer-Miller (0103774)
rsm@zrlaw.com
ZASHIN & RICH CO., L.P.A.
950 Main Avenue, 4th Floor
Cleveland, OH 44113
Telephone: (216) 696-4441
Facsimile: (216) 696-1618

*Attorneys for Defendant The MetroHealth System*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 29, 2024, *Memorandum in Support of Defendant's Motion for Summary Judgment* was filed via the Court's electronic filing system.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties, including the following counsel of record, may access this filing through the Court's electronic filing system:

Jon A. Troyer
jtroyer@aghattorneys.com
Richard W. Arnold
rarnold@aghattorneys.com
ARNOLD GRUBER LTD.
4580 Stephen Cir. NW, Suite 100
Canton, Ohio 44718

*Attorneys for Plaintiff Frank Savel*

*/s/ Natalie M. Stevens*
*One of the Attorneys for Defendant*
*The MetroHealth System*