IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| FRANK SAVEL, *et al.* | ) CASE NO. 1:22-cv-02154-JG |
| *Plaintiffs*, | ) JUDGE JAMES S. GWIN |
| v. | ) |
| THE METROHEALTH SYSTEM | ) **PLAINTIFFS' OPPOSITION TO** |
| *Defendant*. | ) **DEFENDANT'S MOTION FOR** |
| | ) **SUMMARY JUDGMENT** |

Plaintiff Frank Savel ("Savel") hereby responds in opposition to Defendant's Motion for Summary Judgment, which was filed July 29, 2024. This response in opposition is supported by the attached memorandum contra and the declaration and exhibits attached hereto.

**MEMORANDUM CONTRA**

**I.   Introduction**

From the outset, Savel would point out for the record that Ohio Northern District Local Rule 7.1(d) states, "[u]nless otherwise ordered by the Judicial Officer, each party opposing a motion must serve and file a memorandum in opposition within thirty (30) days after service of any dispositive motion… ." (in relevant part). Despite this, the Court initially only gave fourteen days to respond to dispositive motions. [ECF Doc. #33]. Savel requested additional time (until September 16), to respond to MetroHealth's motion for summary judgment based on several factors; 1) the unusually short time frame originally given by the Court, 2) the financial and temporal demands of what was initially to be a class-action matter, 3) the time for discovery was still open and ongoing, and 4) newly revealed information in the Supplemental Declaration of Amanda Calabrese. [ECF Docs. #58, 58-1]. Despite this request, the Court issued a Non-Document Order on August 15, 2024, giving only until August 19 (just four days later, including

1

the weekend days) to respond to MetroHealth's Motion for Summary Judgment. [Exhibit 1]. This date is only 21 days after MetroHealth filed its motion, and still nine days less than the typical 30 days afforded by Local Rule 7.1.

Savel immediately contacted opposing counsel to determine if there was any chance Ms. Calabrese could be available for a video deposition prior to the 19th. [Exhibit 2]. Counsel for MetroHealth stated that they were unavailable, and as far as the request pertained to Ms. Calabrese, they would "determine her availability before the discovery cut off (i.e., before September 16th) and let you know what date/time works." [Id.]. Today, counsel for Savel received a response from MetroHealth that her first availability would be September 6th or 9th. [Id.]. As of this writing, arrangements have been made to take her deposition on September 6, 2024, ten days before the expiration of the Court's imposed discovery deadline.

Moreover, Savel has responded diligently to repeated discovery requests by MetroHealth, producing thousands of pages of documents in response thereto, including over a gigabyte of electronic data, all of which required review by Savel's counsel. [ECF Doc. #58-1]. Given the rather compressed time frame originally afforded to the parties by the Court, such a request is not unusual, nor is it an indicator of "bad faith" on the part of Savel's counsel. Despite whatever responsibility counsel for Savel bears for not uncovering the sought after information earlier, Savel would contend that in the interest of justice he should be allowed to supplement this response in opposition once the deposition of Ms. Calabrese has actually been conducted.

## II. Defendant Does Not Meet Its Initial Burden

MetroHealth's Motion for Summary Judgment should be denied because MetroHealth has failed to meet its initial burden. MetroHealth correctly cites to the U.S. Supreme Court in stating, "the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."

2

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); [ECF Doc. #55-1; PageID 3680]. The entirety of MetroHealth's argument is that Savel cannot establish a *prima facie* showing to support his claims. [ECF Doc. #55-1; PageID 3680]. However, MetroHealth fails its initial burden of demonstrating an "absence of evidence" to support Savel's claims.

Notably, MetroHealth concedes for purpose of its Motion that Savel stated a sincerely held religious belief that was properly communicated to MetroHealth. [Id.; PageID 3680-81]. MetroHealth therefore limits its argument to assertions that either, 1) "Savel cannot establish constructive discharge" or 2) "granting him an exemption from the COVID-19 vaccine requirement would have caused MetroHealth and the patient population that it serves to suffer an undue hardship during the relevant time period." [Id.; PageID 3682, 3685]. On these specific assertions, as already stated, MetroHealth fails to establish its burden showing "an absence of evidence" to support Savel's claims. Nevertheless, even though Savel contends the burden has not shifted to him, he would point out that a *prima facie* showing to support his claims is indeed established by the facts of record in this case.

**III. <u>Factual Evidence Supports Savel's Constructive Discharge Claim</u>**

Regarding MetroHealth's first assertion – that Savel cannot establish constructive discharge – this issue has already been addressed in this case by the Sixth Circuit regarding the plausibility standard for pleading.

> If the defendant forced the plaintiff's hand, and the plaintiff was left with no choice but to give up something of value or suffer an unpleasant consequence, we may recognize that the defendant caused the plaintiff an injury. Likewise, it is well-established that a plaintiff who stops exercising their rights because they reasonably fear prosecution does not need to wait to take legal action; the government has already injured them. See *Kiser v. Reitz*, 765 F.3d 601, 609-10 (6th Cir. 2014). Depending on the context, we have identified different telltale signs that a defendant has forced a plaintiff to take some undesirable action such that the plaintiff has standing to sue.
>
> In the employment discrimination context, this concept of forced resignation is called "constructive discharge." See *Green v. Brennan*, 578 U.S. 547, 560 (2016).

3

> To separate a constructive discharge from an ordinary resignation, we sometimes ask whether the employer clearly communicated to the plaintiff that they were about to be terminated. *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014) (quotation omitted) ("[C]onstructive discharge also occurs where, based on an employer's actions, 'the handwriting was on the wall and the axe was about to fall.'"). If they did, we hold the employer legally responsible as though it fired the employee directly. *Id*.; see also *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004). A plausible allegation of constructive discharge satisfies standing requirements because the resulting lost income and benefits form an "injury in fact" that is "fairly traceable" to the employer. See *Spokeo*, 578 U.S. at 338 (citing *Lujan*, 504 U.S. at 560).

*Savel v. MetroHealth Sys*., 96 F.4th 932, 940-941 (6th Cir. 2024). Admittedly, the Sixth Circuit's decision was dealing with the issue of plausibility at the pleading stage sufficient to create standing, which requires only sufficient allegations. However, in this case there is factual evidence in support of Savel's constructive discharge claim which precludes any summary decision in favor of MetroHealth on this issue.

The Sixth Circuit commented in its decision on certain facts, versus mere allegations, regarding Savel's and Plaintiff Danielle Crockett's claims of constructive discharge:

> Their *allegations* differ from the rest in an important way: Plaintiffs 1 and 2 say they resigned after MetroHealth denied their requests, but before MetroHealth changed its mind and decided to grant all the religious exemptions. This means that MetroHealth placed Plaintiffs 1 and 2 in the difficult position of choosing between following their religion and keeping their jobs. MetroHealth told them that they could not appeal the denial and that their employment would be terminated if they did not get fully vaccinated within forty-five days. *These facts* are adequate to support a theory of forced resignation sufficient to establish standing at this stage.

*Id*. at 942 (emphasis added). Notably, in this case Savel did not merely make allegations—indeed, actual evidence is already in the record on this issue. This factual evidence, which is undisputed, includes the communication received by Savel from MetroHealth stating:

> **After completion of the review process, your request has been denied**. […] Because your position has already been assessed and been determined ineligible for fully remote work, and no other reasonable accommodation is available, this decision is not subject to appeal. **As a result of this decision, you must be fully vaccinated for COVID-19 and submit documentation within 45 days of the date of this letter in order to remain employed by MetroHealth**.

[ECF #12-2; PageID 312] (declared by MetroHealth representative Amanda Calabrese to be a true and accurate copy of MetroHealth's February 2022 decision regarding Savel's exemption request; PageID 302, ¶ 6) (emphasis original). As stated in the Sixth Circuit's opinion, and the cases cited therein, the handwriting was on the wall and the axe was about to fall.

This evidence alone is sufficient to demonstrate that MetroHealth has failed to meet its burden of showing an absence of evidence to support Savel's constructive discharge claim. Any disagreement as to the weight of such evidence is a matter of disputed fact for the jury to decide.

### IV. MetroHealth's Claim of Undue Hardship is Refuted by the Evidence

MetroHealth claims that the second reason it should be granted summary judgment is because granting Savel an exemption accommodation would create an undue hardship. [ECF #55-1; PageID 3685]. They emphasize the safety risks and the need to prevent the spread of disease. [Id.; PageID 3685-86]. Further, they contend that the standard for undue hardship at the time of their decision was "more than a *de minimis*" cost or burden. [Id.; PageID 3686]. While MetroHealth acknowledged that this standard was addressed by the Supreme Court in *Groff v. DeJoy*, the *Groff* decision did not state that "*de minimis*" was ever the proper standard. "We hold that showing 'more than a *de minimis* cost,' as that phrase is used in common parlance, does not suffice to establish 'undue hardship' under Title VII." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). As explained in *Groff*, "the context renders that reading doubtful." *Id*. at 449. The Supreme Court concluded, "We think it is enough to say that an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*. at 470.

Regardless, MetroHealth goes on to assert that even post *Groff*, courts "have found that allowing unvaccinated employees to continue to work in a healthcare setting with vulnerable patients constitutes an undue hardship." [ECF #55-1; PageID 3687]. Central to this assertion is

5

MetroHealth's argument that "although the number of positive COVID-19 cases were declining in Cuyahoga County, they still remained high, and positivity rates remained high at MetroHealth." [Id.; PageID 3688] (citing the Supplemental Declaration of Amanda Calabrese). However, this assertion is contradicted by MetroHealth's own evidence it entered into the record.

Exhibit 1-F, attached to the first Declaration of Amanda Calabrese contains a chart of "COVID-19 Inpatient Census" numbers for MetroHealth that covers a longer range of dates than that given by Ms. Calabrese in her most current Supplemental Declaration. [ECF #12-2, ¶ 8; Page ID 302, 431-33] (compare to ECF #55-2; PageID 3698-99). In her most recent Declaration, Ms. Calabrese only references weekly inpatient counts beginning January 1, 2022; however, in Exhibit 1-F from her first Declaration, the chart graphic shows inpatient numbers going back to September 6, 2021. As clearly shown in that chart, by the time of MetroHealth's denial notices sent on February 7, 2022, numbers had already declined to the numbers from five months earlier. In fact, in that same document (called by Ms. Calabrese, "[a] true and accurate copy of the communication issued by MetroHealth the week of February 14, 2022, titled 'MetroHealth COVID-19 Brief'"), MetroHealth stated, "As COVID numbers continue to trend down, we will not be producing a COVID-19 Brief on a weekly basis. Watch for the next COVID-19 Brief in March." [ECF #12-2; PageID 431]. So apparently within a week of denying hundreds of religious accommodation requests, the COVID numbers were declining so much that MetroHealth no longer found it necessary to issue a weekly update.

Indeed, that same document stated, "Also on Monday, MetroHealth workforce members can return to in-person meetings, including educational and clinical sessions. Masking will be optional in these meetings for workforce members with an NM sticker. Workforce members without an NM sticker will be required to wear a mask and distance. A remote option will be available in most cases." [Id.; PageID 432] (those without an NM sticker were unvaccinated).

6

Further down on that page, a chart was included entitled, "*Updated* COVID-19 Infection Prevention PPE Grid." [Id.] (emphasis added). The column for unvaccinated workers ("Workforce Members without NM Sticker"), shows the personal protection equipment required for such workers to continue to function at all levels within the hospital, including areas involving "High-risk Procedures" which included working with "All Patients" as well as "COVID+ Patients." [Id.]. If it was safe for unvaccinated employees to continue to work in these areas on February 14, 2022, why was Mr. Savel told that it would constitute an "undue burden" for him to do so? Why was Mr. Savel told that the only way he could continue his employment with MetroHealth was if he found a position that was 100% remote? Why were workers who were currently working remotely but requested similar religious exemption accommodations, also denied? [ECF #02, ¶¶ 194, 197, 216, 356, 358, 429; Page ID 31-32, 34, 53, 61].

Further, MetroHealth then CEO Akram Boutros stated in his announcement on March 15, 2022 (reversing course on exemptions), "I believe the costs and burdens in granting non-medical exemptions have changed in a material way. As such, masking and other precautions are adequate and can be used to accommodate non-medical exemption requests." [ECF #55-8, Ex. G; PageID 3743]. Why did it take another month before MetroHealth reversed its decision, despite the low case counts and updated safety precautions already indicated in the February COVID brief? Could the timing of MetroHealth's reversal be because they found out that an injunction action was to be filed against them that same day? [ECF #54-2; PageID 3650]. Moreover, how could PPE be adequate accommodations for the unvaccinated for over a year during the worst of the COVID infections, but over a year after vaccines were made available to MetroHealth, such accommodations suddenly became an undue hardship for those seeking a religious exemption? [Exhibit 3] (vaccines shipped to MetroHealth on December 15, 2020).

7

This disparate treatment alone establishes a *prima facie* case for discrimination. "Under the disparate-impact statute, a plaintiff establishes a prima facie violation by showing that an employer uses 'a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.' 42 U.S.C. § 2000e-2(k)(1)(A)(i)." *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009). This is true whether the disparate outcome was intentional or not. "Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." *Id.*, at 577.

The only conclusion to be drawn from this is not that Savel was simply discriminated against because of his vaccination status (as suggested by MetroHealth, PageID 3691-92), but rather that he was not given any accommodation because of the specific religious position he took in requesting an accommodation. If other unvaccinated workers could be accommodated through the use of PPE as demonstrated in Exhibit 1-F put forth by MetroHealth, why not him? "Disparate-treatment cases present 'the most easily understood type of discrimination,' and occur where an employer has 'treated [a] particular person less favorably than others because of' a protected trait." *Ricci*, at 577. At the very least, the undisputed factual evidence of record creates a material issue of fact on the issue of undue burden, requiring the matter be submitted to the jury for determination.

V. <u>MetroHealth's Arguments are Pretextual</u>

In addition to the claims refuted by the evidence above, MetroHealth also attempts to assert that each religious exemption request underwent an individualized review and implied there was a robust interactive process involving accommodations. However, in looking at Exhibit 1-E, provided with the first Declaration of Amanda Calabrese, all the February 7, 2022, responses sent to the 46 named Plaintiffs in this case are identical except for the name, and whether or not the information provided did, or did not, establish sufficient "basis for an exemption." [ECF 12-2;

8

PageID 311-430]. And even if they did establish a "basis for an exemption," they were denied any accommodation, even if already working remotely (must not have been a very thorough review to tell people already working remotely that their jobs could not be done remotely). *Supra*. Significantly, Ms. Calabrese called these communications MetroHealth's "initial decisions," which indicates there was no interaction at all regarding the accommodation process. [Id., ¶ 7; PageID 302]. MetroHealth failed to engage in good faith bilateral cooperation in regard to Mr. Savel's, and others', religious accommodation requests. *See Vargas v. Sears, Roebuck & Co.*, 1998 U.S. Dist. LEXIS 21148, *15 (E.D. Mich. 1998) (and cases cited therein). Moreover, some had submitted their requests as early as August of the previous year. [ECF #02, ¶¶ 151, 291, 308, 398; PageID 26, 44, 47, 58]. Why did it take such a long time to inform people that their requests for accommodation were denied? Unreasonable delay can be another sign of disparate treatment and discrimination. The "process" engaged in by MetroHealth was neither timely, nor interactive.

## CONCLUSION

In order for an employee to proceed with a claim of religious discrimination, he must first establish a prima facie case by establishing that (1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflict; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement. *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987). In this case, not only has MetroHealth failed in its burden of showing there is no evidence to support Savel's claims, Savel has on the contrary pointed to direct evidence in the record to support his claims. For all the foregoing reasons, summary judgment in this matter in favor of MetroHealth would be improper.

Respectfully submitted,

      /s/ Jon A. Troyer      
Jon A. Troyer (#0080888)

        Richard W. Arnold (#0063367)
        Arnold Gruber, Ltd.
        4580 Stephen Circle, N.W., Suite 100
        Canton, Ohio 44718
        Telephone: (330) 563-4149
        Facsimile: (330) 526-6511
        Email: jtroyer@aghattorneys.com
              rarnold@aghattorneys.com

*Counsel for Plaintiffs*

## LOCAL RULE 7.1 CERTIFICATION

The undersigned counsel hereby certifies that this case is assigned to the standard track, and that this response in opposition to Defendant's Motion for Summary Judgment does not exceed the page limit pursuant to Local Rule 7.1(f).

        Respectfully submitted,

           /s/ Jon A. Troyer
        Jon A. Troyer (#0080888)

**CERTIFICATE OF SERVICE**
OHND Case No. 1:22-cv-02154-JG

I hereby certify that a copy of the foregoing **Plaintiffs' Opposition to Defendant's Motion for Summary Judgment** was served this the 19th day of August, 2024, via the Court's ECF system to the following person(s):

    Natalie M. Stevens (0079963)
    Stephen S. Zashin (0064557)
    Ami J. Patel (0078201)
    Rebecca G. Singer-Miller (0103774)
    ZASHIN & RICH
    950 Main Avenue, 4th Floor
    Cleveland, Ohio 44113
    Telephone: (216) 696-4441
    Facsimile:  (216) 696-1618
    Email: ssz@zrlaw.com
           ajp@zrlaw.com
           nms@zrlaw.com
           rsm@zrlaw.com

*Counsel for Defendant*

        /s/ Jon A. Troyer
    Jon A. Troyer (#0080888)
    Arnold Gruber, Ltd.
    4580 Stephen Circle, N.W., Suite 100
    Canton, Ohio 44718
    Telephone: (330) 563-4149
    Facsimile:  (330) 526-6511
    Email: jtroyer@aghattorneys.com

*Counsel for Plaintiffs*