# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| FRANK SAVEL, | ) | CASE NO. 1:22-CV-02154 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| THE METROHEALTH SYSTEM, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |
| | ) | |
| | ) | (This Order Resolves Docket |
| | ) | Entries ECF #55, ECF #64, ECF #66, |
| | ) | and ECF #68) |

This case is before the Court on Defendant The MetroHealth System's ("MetroHealth") *Motion for Summary Judgment* (ECF #55), filed on July 29, 2024. Plaintiff Frank Savel ("Savel") filed his opposition to the motion on August 19, 2024 (ECF #60). MetroHealth filed its reply on August 26, 2024 (ECF #62). The summary judgment motion is now ready for decision.

For the reasons stated below, Defendant MetroHealth's *Motion for Summary Judgment* (ECF #55) is GRANTED, and the case is dismissed in its entirety.[1]

---

[1]

Also pending before the Court are *Defendant's Motion to Exclude Dr. Stan V. Smith's Expert Reports and to Preclude Dr. Smith from Providing Expert Testimony* (ECF #64); *Defendant's and Non-Party Dr. Boutros' Motion to Quash Plaintiff's Subpoena Duces Tecum to Akram Boutros, M.D.* (ECF #66); and *Plaintiff's Motion to Compel and Objection to the Supplemental Declaration of Amanda Calabrese* (ECF #68). Given the Court's grant of summary

## FACTUAL AND PROCEDURAL HISTORY [2]

This case began as a 46-plaintiff, six-Count *Class Action Complaint for Injunctive Relief and Damages* (ECF #2) ("*Complaint*"), wherein Plaintiff Frank Savel (identified as "Named Plaintiff 1") and 45 other named Plaintiffs alleged that Defendant MetroHealth discriminated against them on the basis of religion, in alleged violation of: Title VII, 42 U.S.C. §2000e, *et seq.* (Count I); the Free Exercise Clause of the First Amendment to the United States Constitution, U.S. CONST. amend. I (Count II); Article 1, Section 1 of the Ohio Constitution, OHIO CONST. art. 1, § 1 ("Inalienable Rights") (Count III); Article 1, Section 7 of the Ohio Constitution, OHIO CONST. art.1, § 7 ("Rights of Religion") (Count IV); the Free Exercise Clause of the First Amendment to the U.S. Constitution, U.S. CONST., amend. I (Count V); and Ohio's anti-discrimination statute, OHIO REV. CODE § 4112 (Count VI). The claims made in the *Complaint* were based on the facts surrounding MetroHealth's adoption of a COVID-19 vaccination policy for its workforce on

---

judgment for Defendant MetroHealth on the only claims remaining in the case, there is no longer a need to rule on the issues raised in these motions, and they are each DENIED as moot.

[2]

      This case was initially assigned to United States District Court Judge James S. Gwin of this Court. (Unnumbered Docket Entry Following Entry ECF #4). On September 23, 2024, the case was reassigned to this Court pursuant to N.D. Ohio General Order 2024-19. (Unnumbered Docket Entry Following Entry ECF #71). The recitation of facts as it relates to events occurring before July 2023 is drawn largely from the text of an earlier-filed opinion, issued by the Court, in connection with a *Motion to Dismiss* all claims, filed by Defendant MetroHealth on March 23, 2023 (ECF #12), published as *Savel v. MetroHealth Sys.*, Case No. 22-CV-01254, 2023 U.S. Dist. LEXIS 120089 (N.D. Ohio July 12, 2023) (Gwin, J.). As the citations supporting the factual record pertinent to the earlier motion to dismiss are included (in footnote form) within the text of the earlier-published opinion, they are not recreated here. Citations to newer events or information now known from the parties' subsequent discovery are included here. To provide context to the overall history of the case, the plural "Plaintiffs" and other plural references to MetroHealth employees used in the earlier recitation of facts are retained within the borrowed text. The *Motion for Summary Judgment* now before the Court addresses what are the only remaining claims of the single remaining Plaintiff, Frank Savel, but the basic facts are those pertaining to all MetroHealth employees covered under the COVID-19 vaccination policy.

August 26, 2021, requiring that all of its employees be either fully vaccinated against COVID-19

by October 30, 2021, or that they had, with accompanying documentation, requested exemption

from the requirement based on a health or medical condition or based on their religious beliefs.

(ECF #2, *Complaint*, ¶¶ 15-18, PageID #8-#9).

Defendant MetroHealth operates as a county-owned hospital in Cuyahoga County, Ohio.

MetroHealth employees work as state employees.  On August 26, 2021, MetroHealth announced a

future requirement that its workforce be fully vaccinated against COVID-19 by October 30, 2021.

MetroHealth also announced that employees could, with proper documentation, request health-

and religion-based vaccine exemptions.  With one exception among the 46 original Plaintiffs, the

Plaintiffs in this case made religious exemption requests related to MetroHealth's vaccination

policy.

After receiving a much higher than expected number of exemption requests, on October

15, 2021, MetroHealth announced that it would not enforce the vaccine mandate against

exemption-seekers until the hospital had sufficient time to review the more than 400 exemption

requests that MetroHealth had received.  Because MetroHealth had not been able to review all the

exemption requests by the date it initially expected to complete them, MetroHealth said it would

not discipline employees who had earlier submitted health or religious exemption requests until

MetroHealth could review their requests.

On February 7, 2022, MetroHealth blanket denied the pending exemption requests of all

those Plaintiffs who were still awaiting responses.  Because the Plaintiffs included in the initial

group all had patient-facing or public-facing positions, MetroHealth told them that

accommodating their requests would cause the hospital undue hardship because the denied

-3-

employees had job roles that could not be remotely performed.  Plaintiff Frank Savel is a

Registered Nurse who was employed in the Medical Intensive Care Unit at MetroHealth (ECF #2,

*Complaint*, ¶ 60, PageID #17), a patient-facing position.

With the February 7, 2022 communication, the hospital told the employees who received

exemption denials they would have 45 days to receive both COVID-19 vaccine doses.  Under the

hospital's February 7, 2022 notice, the 45-day vaccine documentation period would expire on

March 24, 2022.

Plaintiffs allege that MetroHealth categorically denied all religious accommodation

requests, but granted some health-related exemption requests.[3]  The specific letter sent to Plaintiff

Frank Savel stated:

> Your request for COVID-19 vaccination exemption has been carefully
> considered and is denied.  The information you provided established basis for
> an exemption.  However, reasonable accommodation is not available given
> your role and job duties, and MetroHealth would face undue hardship in
> granting your exemption request.  You are not eligible for fully remote work,
> and alternative protocols, such as masking, other protective equipment, regular
> testing, and social distancing, are far less effective and would place you,
> patients, coworkers, and others at significant risk.  Because your position has
> already been assessed and been determined ineligible for fully remote work,
> and no other reasonable accommodation is available, this decision is not
> subject to appeal.

(ECF #2, *Complaint*, ¶ 63, PageID #17; *see also* ECF #55-12, *Feb. 2, 2022 Vaccination*

*Exemption Request Response*, PageID #3761).  One day later, Savel made the decision to look for

employment outside of MetroHealth.  (ECF #55-3, *Savel Dep.*, pp. 111-113, 139, 217-218, PageID

#3713, #3719, #3727); ECF #55-13, *Feb. 8, 2022 E-mail Accepting Invitation to Interview*,

---

[3]

The evidence now shows that this assertion is not correct.  In fact, MetroHealth received
316 non-medical/religious exemption requests, 19 of which were initially approved (ECF #55-2,
*Supplemental Declaration of Amanda Calabrese*, ¶ 10, PageID #3697).

PageID #3763).  One week after that, Plaintiff Savel was offered and accepted a comparable

position at University Hospitals as a registered nurse in its Medical Intensive Care Unit, in what

was effectively the same position he held at MetroHealth.  (ECF #55-3, *Savel Dep.*, pp. 111-113,

217-220, PageID #3713, #3727; ECF #55-14, *Feb. 16, 2022 E-mail Offer and Acceptance*, PageID

#3764-#3765).

MetroHealth later changed its COVID-19 vaccine requirement.  On March 15, 2022, and

before the earlier-announced March 24, 2022 deadline for all employees to be vaccinated against

COVID-19, MetroHealth amended its position to allow religious exemptions even for those

employees whose jobs were not classified as fully remote.  In explaining its decision in March

2022 to grant the exemptions, MetroHealth's CEO stated the change was motivated by a then-

declining rate of COVID-19 infections, and announced that the "costs and burdens in granting

non-medical exemptions [had] changed in a material way."

With the change, the hospital granted all of the original Plaintiffs who were still at

MetroHealth their previously denied exemptions.  The following day, the hospital explained that

unvaccinated employees would not be terminated but be required to continue wearing surgical

masks and to maintain social distancing whenever possible, including by not eating in group

environments such as the cafeteria or break room.

On November 30, 2022, Plaintiffs sued MetroHealth.  With their lawsuit, Plaintiffs alleged

that MetroHealth violated Title VII by discriminating against Plaintiffs based on religion, and that

MetroHealth's vaccination policies infringed on Plaintiffs' First Amendment religion free exercise

rights.  Plaintiffs also brought state-law claims under Articles 1 and 7 Section 1 of the Ohio

Constitution and [Ohio Revised Code] § 4112.

On July 12, 2023, in ruling on a *Motion to Dismiss* filed by Defendant MetroHealth (ECF #12), Judge Gwin of this Court (*see* note 2, *supra*) granted the *Motion to Dismiss*, finding that some of the named Plaintiffs, who were still employed by MetroHealth at the time of the filing of the *Complaint*, had not alleged an injury sufficient to give standing to bring their Title VII and Ohio Revised Code § 4112 claims (Plaintiffs 10-46).  As to the nine named Plaintiffs who had resigned from MetroHealth prior to the filing of the lawsuit (Plaintiffs 1-9, which included Savel), the Court found they had standing, but concluded they also had failed to state claims under Title VII and Ohio Revised Code § 4112.  *Savel v. MetroHealth*, 2023 U.S. Dist. LEXIS 120089, at *2.

Plaintiffs then appealed the dismissal to the United States Court of Appeals for the Sixth Circuit (Case No. 23-3672).  The Sixth Circuit ultimately made the following four rulings:  (1) it affirmed the dismissal as to the Plaintiffs who were still employed at MetroHealth, agreeing with the district court that they could not establish standing; (2) it affirmed the dismissal of the claims of those Plaintiffs who had resigned after submitting exemption requests but had not received a denial of their requests, agreeing with the district court that they too lacked standing because such facts did not support a claim of "constructive discharge"; (3) it affirmed the dismissal of two other Plaintiffs for lack of standing as they had failed to even plausibly allege that they were forced to resign; and (4) it reversed and remanded the case as to two Plaintiffs (Plaintiffs 1 and 2, Savel and another who had resigned after MetroHealth had denied their requests for exemption but before MetroHealth had decided to change its policy to grant all the pending requests for religious exemptions).  *Savel v. MetroHealth*, 96 F.4th 932 (6th Cir. 2024).  As to Plaintiffs 1 and 2 (Savel and another), the court of appeals held that, at least at the motion to dismiss stage of the case, these Plaintiffs had pled sufficient allegations to survive dismissal on standing grounds and that they had

"plausibly pleaded" their claim of failure to accommodate their religious practices and their claim of disparate treatment:

> According to the plaintiffs, MetroHealth gave no indication that it would reconsider the denials during the forty-five days. When the grace period was more than halfway over and MetroHealth still had not signaled that things might change, Plaintiffs 1 and 2 left. These facts plausibly allege that MetroHealth communicated to Plaintiffs 1 and 2 that they would be terminated after forty-five days if they refused to be vaccinated on religious grounds. It is possible that Plaintiffs 1 and 2 may lack standing at a later phase of this litigation based on additional evidence about the certainty of termination. But plausibility is all that is required at this stage, and "a well-pleaded complaint may proceed even if it strikes a savvy judge . . . 'that recovery is very remote and unlikely.'"

> * * *

> Plaintiffs 1 and 2 plausibly pleaded that MetroHealth failed to make reasonable accommodations for their religious practices. * * * Plaintiffs 1 and 2 also plausibly alleged that MetroHealth treated them differently from other employees by forcing them to resign because of their religion. * * *

> As with the failure-to-accommodate claim, the district court prematurely applied the prima facie case requirements to the disparate treatment claim and found it lacking. The district court expected too much of Plaintiffs 1 and 2 at this early stage. Time – and, crucially, discovery – will tell whether Plaintiffs 1 and 2 satisfy the prima facie case requirements. The district court may ultimately be right that they cannot make that showing. But at the pleading stage, it is too soon to consider that question.

*Savel*, 96 F.4th at 942, 943-44.

After remand, Plaintiff 2 (Danielle Crockett) moved to dismiss her claims without prejudice, on the ground that "the demands of litigation are unduly interfering with her current employment and beyond her emotional stress tolerance at this time." (ECF #39, *Motion for Dismissal of Claims of Plaintiff Danielle Crockett*, p.1, PageID #1107). Defendant MetroHealth opposed the motion to dismiss *without* prejudice, stating "Defendant does not oppose the dismissal of Crockett's claims, but contends that the dismissal should be *with prejudice* for several reasons,

-7-

including, but not limited to, (1) the length of time that this matter has been pending, (2) Plaintiff

Crockett's dilatory conduct in discovery, (3) the fact that her federal claim would be time-barred if

she tried to refile it in the future, and (4) the resulting prejudice to Defendant of having to defend

against Plaintiff Savel's claims now, and Plaintiff Crockett's in the future, which are derived out

of the same facts and circumstances, *i.e.*, their requests for exemptions from MetroHealth's

COVID-19 vaccination requirement." (ECF #40, *Defendant's Response to Plaintiff Danielle*

*Crockett's Motion for Dismissal Without Prejudice of Her Claims*, p.1, PageID #1117).[4]

---

[4]

     On June 18, 2024, MetroHealth filed a *Motion for Leave to Supplement Response Instanter to Plaintiff Danielle Crockett's Motion for Dismissal of Her Claims* (ECF #43), noting that Plaintiff Crockett had never responded to Defendant MetroHealth's interrogatories and requests for production, which were due on April 22, 2024; she did not appear for her deposition scheduled for June 11, 2014; she had not submitted a demand in accordance with the Court's *Order Setting Mediation Conference* (ECF #36), which had required that such a demand be made "no later than 21 days prior to the mediation conference"; and that she had not appeared for the court-ordered mediation held on June 18, 2024. (ECF #43, pp.1-2, PageID #1142-#1143).

     While the Court is hereby denying as moot *Plaintiff's Motion to Compel and Objection to the Supplemental Declaration of Amanda Calabrese* (ECF #68) and the related *Defendant's and Non-Party Dr. Boutros' Motion to Quash Plaintiff's Subpoena Duces Tecum to Akram Boutros, M.D.* (ECF #66), the Court notes that the briefing on these motions reveals that as of September 20, 2024 (four days after the end of an already-extended discovery deadline [the original date of which was effectively set by a July 29, 2024 dispositive motion deadline]), Plaintiff Savel also had not propounded any interrogatories, requests for production of documents, or requests for admission to MetroHealth under Federal Rules of Civil Procedure 33, 34, or 36. (*See* ECF #66, p.2, PageID #4032 & ECF #71, p.3, PageID #4387). Instead, Plaintiff Savel sought to obtain through deposition *subpoenas duces tecum* "All internal and external communications relevant to the decisions made by MetroHealth related in any way to the COVID-19 and/or influenza vaccine exemption requests, whether medical or religious, by any MetroHealth employee, student, or contractor during the time period from March 1, 2020 to December 31, 2022," from non-party deponent Akram Boutros, M.D. (who was no longer employed by MetroHealth at the time), served on August 23, 2024, and "[A]ll documents and communications, whether or not originally in electronic or printed form, that refutes or supports in any way, or that pertains in any way to, any statement or declaration made by Deponent in any Declaration entered into the record of this case" (which effectively sought the same universe of documents), from non-party MetroHealth Human Resources Project Specialist Amanda Calabrese, also served on August 23, 2024. (See ECF #61 & ECF #63). Neither of these requests for what are clearly MetroHealth's documents

On June 26, 2024, Judge Gwin of this Court (*see* note 2, *supra*) issued the following order:

> [T]he Court GRANTS Defendant MetroHealth's motion to supplement *instanter* its response to Plaintiff Crockett's motion to dismiss and DENIES Plaintiff Crockett's motion to dismiss without prejudice.
>
> Further, the Court ORDERS that Plaintiff Crockett must file a notice by July 2, 2024 that indicates whether she intends to have her claims dismissed with prejudice, or whether she intends to proceed with the case, conditioned on her compliance with remaining discovery requirements, The Court will enter a separate order based on Plaintiff Crockett's selection. Failure by Crockett to timely file her notice in compliance with this order will result in the case being dismissed with prejudice.

(ECF #44, *Order*, p.8, PageID #1158).

On July 2, 2024, Plaintiff Crockett responded that, "[s]he does not wish to continue in this litigation at this time." (ECF #45, *Notice of Response to Order on Dismissal of Claims of Plaintiff Danielle Crockett*, p.3, PageID #1161). Accordingly, on July 9, 2024, Judge Gwin issued the following order, "The Court has given Plaintiff Crockett the option to continue pursuing her claims in this case, but she has declined[;] [s]o, the Court DISMISSES WITH PREJUDICE Plaintiff Crockett from this matter." (ECF #47, p.4, PageID #1183). Thus, as the case now comes to this Court's docket, only Plaintiff Savel's claims remain.

---

would have allowed MetroHealth the 30-day response time prior to the end of the (even extended) discovery period set forth in Federal Rule of Civil Procedure 34(b)(2) if such documents were appropriately sought from MetroHealth. While no definitive ruling is made here on the now-moot motions, the Court notes that, in order to be considered timely, discovery requests must be served so as to allow the recipient the 30-day response time allowed under Rule 34 prior to the discovery cut-off date. *See, e.g., Enyart v. Karnes*, No. 2:09-CV-687, 2010 U.S. Dist. LEXIS 120411, at *4 (S.D. Ohio Nov. 12, 2010) ("[D]iscovery propounded fewer than thirty days prior to the discovery completion date is not timely"); *Burton v. Mich. Dep't of Corr.*, No. 20-CV-12501, 2023 U.S. Dist. LEXIS 239151, at *2 (E.D. Mich. June 22, 2023) ("Since a party must respond or object to discovery requests within 30 days of being served, 'a party must serve his discovery requests at least thirty days before the court-ordered discovery deadline to be timely and to necessitate a response").

At the same time that MetroHealth denied Plaintiff Savel's request for a religious exemption based on the fact that Savel's position required direct patient contact and could not be performed 100% remotely, on February 7, 2022, he was invited to explore job vacancies at MetroHealth that could be performed fully remote.  (ECF #55-12, *Feb. 2, 2022 Vaccination Exemption Request Response*, PageID #3762) ("Meanwhile, during this 45-day period, you are welcome to explore job vacancies at MetroHealth that are designated as fully remote.  You may visit metrohealth.org/careers to review the duties and qualifications of current vacancies.  You may email questions about certain vacancies for which you qualify to TalentAquisition.org.  Please note that, if interested, you should apply for fully remote positions for which you qualify as soon as possible because the 45-day vaccine deadline will continue to apply.").  Initially, Plaintiff Savel testified that he did not consult the website or send any e-mails to the e-mail address MetroHealth identified as a means of exploring fully remote options, (*see* ECF #55-3, *Deposition of Frank M. Savel, March 29, 2024*, pp. 126-127, 164, PageID #3717, #3721) (hereinafter "*Savel Dep.*"), but he subsequently changed his testimony during the continuation of his deposition to say he "thought he looked at the postings" the night of February 8, 2024, but acknowledged that he "didn't look that long" and did not consult anyone at MetroHealth about exploring remote options.  (*see* ECF #55-3, *Savel Dep., July 24, 2024*, pp. 224-225, PageID #3728-#3729).

As earlier noted, within a day of receiving the February 7, 2022 exemption decision, Plaintiff Savel applied for and scheduled an interview for a position with University Hospitals.  (ECF #55-3, *Savel Dep.*, pp. 111-113, 139, 217-218, PageID #3713, #3719, #3727); ECF #55-13, *Feb. 8, 2022 E-mail Accepting Invitation to Interview*, PageID #3763).  By February 16, 2022, Plaintiff Savel was offered and accepted a comparable position at University Hospitals as a

-10-

registered nurse in its Medical Intensive Care Unit, in effect, the same position he held at

MetroHealth.  (ECF #55-3, *Savel Dep.*, pp. 111-113, 217-220, PageID #3713, #3727; ECF #55-14,

*Feb. 16, 2022 E-mail Offer and Acceptance*, PageID #3764-#3765).

      Upon accepting the position at University Hospitals, Plaintiff Savel informed his manager

at MetroHealth of his decision to leave for that position, but continued to work for MetroHealth

for two weeks longer, through March 4, 2022, then chose to take a few weeks off in unpaid time

before beginning his employment at University Hospitals on March 28, 2022.  (ECF #55-3, *Savel*

*Dep.*, pp. 106, 114-117, 219-220, PageID #3712, #3714, #3727).  At the time Plaintiff Savel

accepted the position at University Hospitals, he knew that his counsel planned to seek injunctive

relief to prevent MetroHealth from taking any adverse action against employees whose religious

exemption requests were denied, including himself, which MetroHealth never did as it

subsequently allowed the exemptions that it had initially denied.  (*See* ECF #55-3, *Savel Dep.*, pp.

228-230, 259-261, PageID #3729-#3730, #3733-#3734).[5]

      In connection with his decision to leave MetroHealth, Plaintiff Savel inquired about his

accrued but unused vacation and sick time.  (ECF #55-3, *Savel Dep.*, pp. 117-119, PageID #3714-

#3715).  MetroHealth informed him that he would be paid out the accrued unused vacation time,

and that there were two options with regard to the sick time under MetroHealth policy:  (1) the

sick time would be frozen and potentially available for use if he returned to a public employer in

---

[5]
      In a ruling made during Plaintiff Savel's deposition, the Court held that asking Savel about
the date he learned of his counsel's decision to prepare and file a complaint for injunctive relief
did not implicate any attorney/client privilege issue, because Savel had waived any such privilege
by telling the information to the Ohio Civil Rights Commission, and that asking such question did
not require revealing any legal strategy between Savel and his counsel.  (ECF #55-3, *Savel Dep.*,
pp. 259-260, PageID #3733).

the future or (2) if he retired from the Ohio Public Employees Retirement System ("OPERS") and from MetroHealth, he would be eligible for one-half of the number of accrued unused sick hours. (ECF #55-3, *Savel Dep.*, pp. 123-124, PageID #3716). Plaintiff Savel elected not to freeze the sick time, but instead made the decision to retire from OPERS at the age of 55 with a reduced monthly benefit. (ECF #55-3, *Savel Dep.*, pp. 124, 156, 163, PageID #3716, #3720, #3721). Notably, he was eligible to withdraw his OPERS retirement application within 30 days of receipt of the first monthly payment received, in effect, within 30 days of April 1, 2022, if he decided to change his effective retirement date or to return to an OPERS covered employer to accrue additional service credit and retire later. (ECF #55-3, *Savel Dep.*, pp. 132, 166, PageID #3718, #3722; ECF #55-15, *March 10, 2022 OPERS Letter*, PageID #3766).

Again, as earlier noted, on March 15, 2022, MetroHealth, in response to declining COVID-19 positivity rates, the end of the winter season, and a number of recent forecast models, announced to its employees that its COVID-19 vaccination policy could now reasonably accommodate without undue hardship unvaccinated employees whose essential functions could not be performed 100% remotely so long as such employees followed all other applicable COVID-19 safety precautions. (ECF #55-8, *March 15, 2022 COVID Medical and Non-Medical Exemption Announcement*, PageID #3742-#3743; ECF #12-2, *Declaration of Amanda Calabrese*, ¶ 9, PageID #302; ECF #22-1, *Supplemental Declaration of Amanda Calabrese*, ¶ 7, PageID #989; ECF #55-2, *Supplemental Declaration of Amanda Calabrese*, ¶¶ 12-14, PageID #3697-#3699).

In mid-March 2022, Savel's former MetroHealth co-workers threw him a retirement party, at which time they informed him that MetroHealth was now going to allow exemption requests for those whose requests were initially denied on grounds that their positions could not be performed

-12-

100% remotely. (ECF #55-3, *Savel Dep.*, pp. 127-130, PageID #3717-#3718). Despite learning of MetroHealth's decision to now grant the exemption requests prior to beginning employment at University Hospitals and prior to the deadline to withdraw his OPERS retirement application, Savel did not contact anyone at MetroHealth to inquire about returning to his position – even though his manager had informed him that "she would be happy to see [him] back," nor did he ever seek to withdraw his OPERS retirement application. (ECF #55-3, *Savel Dep.*, pp. 127-130, 132, 167-168, 233-234, PageID #3717-#3718, #3722, #3731; ECF #55-16, *June 6, 2022 Savel E-mail to Ohio Civil Rights Commission*, PageID #3769).

These are the facts now before the Court on which to decide whether Plaintiff Savel has established a *prima facie* "failure to accommodate" claim or a "disparate treatment" claim sufficient to survive a motion for summary judgment. *See Savel v. MetroHealth*, 96 F.4th 932, 944 (6th Cir. 2024) ("Time – and, crucially, discovery – will tell whether Plaintiffs 1 and 2 satisfy the prima facie case requirements.").

The Court has reviewed the record before it, including the full briefing of the parties and the affidavits, exhibits, and other evidence cited by both parties, and applying the appropriate standards of review, finds that Defendant's *Motion for Summary Judgment* (ECF #55) should be GRANTED in its entirety.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-movant. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). There is no genuine issue of material fact if the relevant evidence in the record, taken as a whole, indicates that a reasonable fact-finder could not return a verdict for the party opposing summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the defendant "successfully demonstrates, after a reasonable period of discovery, that the plaintiff cannot produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case . . . ," the court should grant summary judgment. *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004).

## LEGAL ANALYSIS

Plaintiff Frank Savel alleges that MetroHealth failed to accommodate his religious beliefs and treated him differently because of his religious beliefs in violation of Title VII and Ohio

Revised Code § 4112 by denying his request for a religious exemption to its COVID-19 vaccine requirement (ECF #2, *Complaint*, ¶¶ 497-506, PageID #71 [Count I, Title VII] & ¶¶ 541-553, PageID #76-#77 [Count VI, OHIO REV. CODE § 4112]).  The analysis applicable to Savel's Ohio law claim is the same as that applied by federal courts in Title VII cases.  *See Isensee v. Amplity, Inc.*, No. 3:22-CV-370, 2024 U.S. Dist LEXIS 85982, at *8 (S.D. Ohio May 13, 2024) (Ohio Supreme Court has held that federal case law interpreting Title VII is generally applicable to cases involving alleged violations of Ohio Revised Code § 4112) (citing *Ohio Civ. Rights Comm'n v. David Richard Ingram, D.C., Inc.*, 69 Ohio St. 3d 89, 93, 630 N.E.2d 669, 672 (Ohio 1994), in turn citing *Plumbers & Steamfitters Joint Apprenticeship Comm'n v. Ohio Civ Rights Comm'n*, 66 Ohio St. 2d 192, 196, 421 N.E.2d  128, 131 (Ohio 1981)).

### Plaintiff's Failure to Accommodate Claim

To state a *prima facie* claim of "failure to accommodate" a religious belief under Title VII (and thus Ohio Revised Code § 4112, as well),  a plaintiff must establish that: (1) he holds a sincere religious belief that conflicted with an employment requirement; (2) he informed his employer of the conflict; and (3) his employer discriminated against him because of his religious beliefs by disciplining him or discharging him for failing to comply with the conflicting employment requirement.  *See DeVore v. Univ. of Ky. Bd. of Trs.*, No. 23-5890, 2024 U.S. App. LEXIS 25695, at *11 (6th Cir. Oct. 11, 2024); *Reed v. Int'l Union, UAW*, 569 F.3d 576, 580 (6th Cir. 2009); *Bolden v. Lowes Home Ctrs.*, LLC, 783 F. App'x 589, 597 (6th Cir. 2019).  For the purposes of this Court's analysis in ruling upon the motion for summary judgment, MetroHealth has assumed in its motion that Savel can establish the first two elements of a failure to accommodate claim, without waiving its right to later contest the first element in the event the

-15-

Court did not grant the motion. (See ECF #55-1, *Memorandum in Support of Defendant's Motion for Summary Judgment*, pp. 8-9, n.10, PageID #3680-#3681). Thus, the Court turns to the third element, that Savel was allegedly disciplined or discharged for failing to comply with MetroHealth's then-existing COVID-19 vaccination policy.

Plaintiff Savel's failure to accommodate claim fails as a matter of law because there is no evidence to support his claim that he was either disciplined or discharged – either actually or constructively – because of his decision not to comply with MetroHealth's COVID-19 vaccination requirement. There are no facts at all identified to support a claim that Savel was disciplined for not receiving a COVID-19 vaccination. There are also no facts at all presented to support that he was *actually discharged* for not receiving the vaccination. The facts do show that Savel chose to secure alternative employment, which he was able to do within approximately one-week's time in a position that was the same as the one he had at MetroHealth, and voluntarily resigned his employment at MetroHealth, providing a two-week notice period, without having received any discipline from MetroHealth or being actually discharged. (ECF #55-3, *Savel Dep.*, pp. 106, 114-117, 228-230, 259-261, PageID #3712, #3714, #3729-#3730). Resignations are generally presumed to be voluntary, absent an indication that the resignation was the result of a "constructive discharge." *Kirk v. Hockenberry*, No. 1:14-CV-713, 2016 U.S. Dist. LEXIS 11392, at *14 (S.D. Ohio Feb. 1, 2016) (citing *Rhoads v. Bd. of Educ. of Mad River Local Sch. Dist.*, 103 F. App'x 888, 895 (6th Cir. 2004)).

Thus, to survive a motion for summary judgment, Savel must present evidence to support a *prima facie* case that his resignation was the result of constructive discharge. A constructive discharge occurs when an employer deliberately makes an employee's working conditions so

-16-

intolerable that the employee is forced into an involuntary resignation. *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014). To do this, a plaintiff must show that: (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; and (2) the employer did so with the intention of forcing the employee to quit. *See Laster*, 746 F.3d at 728; *Edwards v. City of Cincinnati*, No. 1:22-CV-503, 2023 U.S. Dist. LEXIS 4748, at \*10 (S.D. Ohio Jan. 10, 2023), *aff'd* 2023 U.S. App LEXIS 22057 (6th Cir. Aug. 21, 2023); *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 635 (6th Cir. 2003). An employee's subjective beliefs are not sufficient to meet the burden of establishing a constructive discharge. *Henry v. Abbott Labs.*, 651 F. App's 494, 508 (6th Cir. 2016). The employee must prove objectively intolerable working conditions and that the employer intended for him to quit. *Fletcher v. U.S. Renal Care*, 709 F. App'x 347, 351 (6th Cir. 2017). Alternatively, a plaintiff must show that he resigned when it was absolutely clear that termination was imminent. *Laster*, 746 F.3d at 727; *Goldmeier*, 337 F.3d at 636.

The evidence identified does not establish "intolerable working conditions," as perceived by a reasonable person, in any manner. While Savel initially contended that MetroHealth "rolled 24/7 video loops berating the unvaccinated," (ECF #55-3, *Savel Dep.*, pp. 227-228, PageID #3729; *see also* ECF #55-16, *June 6, 2022 Savel E-mail to Ohio Civil Rights Commission*, PageID #3769), at his deposition he immediately later admitted that the word "berating" "may have been overstating," and that the videos that played on various screens located throughout the hospital merely "promoted the efficacy of their vaccine, and [addressed] questions that some people who are unvaccinated might have, (ECF #55-3, *Savel Dep.*, p. 228, PageID #3769). He also acknowledged that the video loops did not "relate in any way or make any comments about religion" (ECF #55-3, *Savel Dep.*, p.

-17-

228, PageID #3769).  The evidence also shows that Savel continued working at MetroHealth for several weeks after securing comparable alternative employment with University Hospitals and providing notice of his resignation (ECF #55-3, *Savel Dep.*, pp. 106, 114-117, PageID #3712, #3714).  No reasonable fact-finder could come to the conclusion that these facts establish the essential element of "intolerable working conditions."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Nor does the evidence support a possible conclusion that MetroHealth deliberately created intolerable working conditions with the intention of forcing Savel to quit his position, or that it was absolutely clear that termination was imminent.  In fact, the evidence produced shows the opposite.  It is undisputed that MetroHealth asked those employees whose non-medical/religious exemption requests were initially denied – as well as those whose medical exemption requests were initially denied – to get vaccinated for *safety* reasons, and further welcomed those employees to explore positions at MetroHealth that could be performed fully remote, for which they would not need to be vaccinated.  (ECF #55-12, *Feb. 2, 2022 Vaccination Exemption Request Response*, PageID #3761-#3762; ECF #55-2, *Supplemental Declaration of Amanda Calabrese*, ¶¶ 5, 9 & 11, PageID #3696-#3697).  The fact that MetroHealth was offering these employees the option of pursuing fully remote positions, where the safety need for vaccination was not a factor, contradicts a finding that MetroHealth was either creating intolerable working conditions or that termination was "imminent."

Moreover, on February 8, 2002, just one day into the 45-day period to either get vaccinated or to explore fully remote positions at MetroHealth – well before there would have been a conflict between Savel's asserted religious belief to not get vaccinated and MetroHealth's COVID-19

-18-

vaccine policy (in effect, those not vaccinated could continue working at MetroHealth awaiting a possible change in the policy to perhaps allow additional exemptions, as numerous other employees whose initial requests for medical or religious exemptions had been denied in fact did)[6] – Savel had already begun the process of finding alternative work. (ECF #55-3, *Savel Dep.*, pp. 111-113, 139, 217-218, Page ID #3713, #3719, #3727; ECF #55-13, *Feb. 8, 2022 E-mail Accepting Invitation to Interview*, PageID #3763). Just over one week later, the evidence shows that Savel had been hired by University Hospitals to a position identical in essentially every aspect to the position he had at MetroHealth. (ECF 55-14, *Feb. 16, 2022 E-mail Offer and Acceptance*, PageID #3764-#3765). This presents a factual and legal circumstance almost identical to that addressed by the Sixth Circuit in *Goldmeier v. Allstate Ins. Co.*, 377 F.3d 629 (6th Cir. 2003), wherein the Sixth Circuit held that plaintiffs, Sabbath-observant Orthodox Jews who asserted that their employer had "intransigently refused" to adjust its weekend office hours policy to accommodate their Sabbath obligations, could not establish a constructive discharge after they had obtained alternative employment and had resigned fifty-three days before the first *actual* conflict between their religious and employment requirements would have occurred (potential discipline or discharge for failing to comply with weekend office hours policy prior to a specified date). As the Sixth Circuit panel noted in *Goldmeier*, distinguishing the case before it from an earlier case where the plaintiff had resigned just one day before the actual conflict was to occur:

---

[6]

In fact, the evidence produced shows that of the 297 employees whose non-medical religious exemption requests were initially denied, only eleven (including Savel and the earlier-mentioned Danielle Crockett) resigned between February 7 and March 15, 2022 (the date MetroHealth announced to its employees the changes to its COVID-19 vaccination exemption policy) claiming that their resignations were vaccine-related; and of these eleven, only two of them (Savel and Crockett) filed charges of discrimination. (ECF #55-2, *Supplemental Declaration of Amanda Calabrese*, ¶ 15, PageID #3699).

Allstate intransigently refused to adjust the new office hours to be more congenial to the Goldmeiers. This intransigence, if it had not been tempered, as in fact it was [similar to this case, the policy at issue was amended after the Goldmeiers resigned in a manner which would have eliminated any conflict between the policy and the Goldmeiers' religious concerns], could potentially have led to an actual discharge at some point in the future. The Goldmeiers cite *Cooper* [*v. Oak Rubber Co.*, 15 F.3d 1375 (6th Cir. 1994)] for the proposition that the mere prospect of discipline at some future point in time is sufficient to create a hostile work environment. However, Cooper resigned the day before her Sabbath absence would, cumulatively with the discipline for her earlier Sabbath absences, inevitably have led to her suspension under the employer's announced rule. *Cooper*, 15 F.3d at 1378, 1379 n.1. Thus, the threat of discharge had an immediacy which contrasts sharply with the circumstances of the Goldmeiers who continued to work for Allstate until both of them had found new employment and then resigned fifty-three days before there would have been the first actual conflict between their religious and employment requirements. Even in combination, all circumstances of employment cited by the Goldmeiers are legally insufficient to create an intolerably hostile work environment.

377 F.3d at 636 (inserts supplied).[7] The court further noted, in granting summary judgment to

Allstate, that the subsequent change in application of the policy made available to the Goldmeiers

shortly after their resignations, which would have alleviated any conflict, negated a finding that

Allstate had deliberately created intolerable working conditions with the intention of forcing the

Goldmeiers to quit. *Id.* Accordingly, the Sixth Circuit held that there was no genuine material

issue of fact arising over the issue of whether the Goldmeiers were constructively discharged. *Id.*

---

[7]

    In a short concurring opinion appended to the Sixth Circuit's decision in *Savel v. MetroHealth*, 96 F.4th 932 (6th Cir. 2024), one of the judges on the panel posited the following question, "What if Plaintiffs 1 and 2, after seeing the writing on the wall, got jobs elsewhere? What if those jobs required them to start a few weeks before March 24? And what if they left MetroHealth voluntarily before March 24? Would that end the lawsuit? Doubtful." *Savel*, 96 F.4th at 945 (Sutton, C.J., concurring). Given the holding of the earlier Sixth Circuit panel decision in *Goldmeier*, a published opinion found at 377 F.3d 629, the answer appears instead to be clearly "yes." *See* SIXTH CIR. R. 32.1(b) ("Published panel opinions are binding on later panels. A published opinion is overruled only by the court en banc.").

Nor does a genuine material issue of fact on "constructive discharge" arise here.[8]

Adding to the grounds necessitating a grant of summary judgment in this case is the fact that even if the facts did support a possibility that a fact-finder might come to the conclusion that Savel was disciplined, discharged, or constructively discharged, the undisputed evidence shows that the actions taken by MetroHealth in connection with its COVID-19 policy as it related to patient-facing or public-facing employees were based on safety concerns and vaccination status, and not on religion. In fact, Savel acknowledges that the employees whose exemptions were denied were informed that "We have been told that we are a threat to the health not just to ourselves but our coworkers and the population at large due to our unvaccinated status." (ECF #55-3, *Savel Dep.*, p. 226, PageID #3729). "Vaccination status is not a class to which Title VII protections apply." *See Robertson v. McKesson Corp.*, No. 2:23-CV-2334, 2023 U.S. Dist. LEXIS 141159, at *18 (S.D. Ohio Aug. 11, 2023) (citing the earlier decision in this case, *Savel v. MetroHealth*, 2023 U.S. Dist. LEXIS 120089, at *21), *adopted and affirmed* 2023 U.S. Dist. LEXIS 188996 (S.D. Ohio Oct. 20, 2023).

Accordingly, Plaintiff Savel's failure to accommodate claim fails as a matter of law under both Title VII and Ohio Revised Code § 4112 based on a failure to state a *prima facie* case.

## Undue Hardship Defense in Failure to Accommodate Analysis

Nor does Plaintiff Savel establish a viable claim of "failure to accommodate" sufficient to survive a motion for summary judgment, as his claim still fails as a matter of law in that granting

---

[8] Adding to this is the fact that, as of February 16, 2022, when Savel accepted the position at University Hospitals, he already knew that his counsel planned to seek injunctive relief to prevent MetroHealth from discharging or taking any other adverse action against those employees whose religious exemptions had been denied, making the actual possibility of discharge at the end of the 45-day period even less of an inevitable outcome.

his request for an exemption from COVID-19 vaccination during the relevant time period would have caused MetroHealth and its patient population an undue hardship.

A court is permitted assess an employer's defense of undue hardship as a matter of law where the proposed accommodation would either cause or increase safety risks or the risk of legal liability. *See Villareal v. Rocky Knoll Health Care Ctr.*, No. 21-CV-729, 2022 U.S. Dist. LEXIS 210267, at *18 (E.D. Wis. Nov. 21, 2022) ("Although undue hardship is usually treated as an issue of fact, where an employer can demonstrate that 'the proposed accommodation would either cause or increase safety risks or the risks of legal liability' the issue can be resolved as a matter of law.") (quoting *EEOC v. Oak-Rite Mfg. Corp.*, No. IP 99-1962-C H/G, 2001 U.S. Dist. LEXIS 15621, at *31 (S.D. Ind. Aug. 27, 2001) (citing numerous cases, including *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 521 (6th Cir. 1976) ("[S]afety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on an employer's business.") and *Mohamed-Sheik v. Golden Foods/Golden Brands LLC*, No. 303-CV-737H, 2006 U.S. Dist. LEXIS 11248, at *11 ("Cases within the Sixth Circuit and other jurisdictions establish that an employer is not required to accommodate a religious concern when doing so would potentially create a safety risk to its employees or a legal risk for the employer.")).

Courts have consistently held that employers have a strong interest in preventing the spread of communicable diseases, including COVID-19, particularly in the health care context. *See Villareal v. Rocky Knoll Health Ctr.*, No. 21-CV-729, 2022 U.S. Dist. LEXIS 97364, at *10-*11 (E.D. Wis. June 1, 2022). "Title VII does not require that safety be subordinated to the religious beliefs of employees." *Draper*, 527 F.2d at 521; *see also Speer v. Ucor LLC*, No. 3:22-

-22-

CV-426, 2023 U.S. Dist. LEXIS 198889, at *20 (E.D. Tenn. Nov. 6, 2023) (citing *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2012) ("A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship.").

While the pertinent standard for determining "undue hardship" has recently been modified from that applied in earlier decisions, MetroHealth still meets the standard to be entitled to summary judgment. At the time MetroHealth made its initial determinations as to non-medical/religious exemption requests the undue hardship defense to providing a religious accommodation under Title VII was defined by the Supreme Court as requiring a showing that the proposed accommodation in a particular case posed "more than a *de minimis*" cost or burden. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977). Although this standard has since been modified by the Supreme Court in *Groff v. DeJoy*, 600 U.S. 447 (2023) (relating to a postal worker's Sunday Sabbath obligations being in conflict with the U.S. Post Office's contract with retailer Amazon to make Sunday deliveries), the Title VII undue burden standard remains lower than the undue hardship standard applied in Americans With Disability Act ("ADA") cases, and the Supreme Court specifically declined to incorporate ADA case law and its higher "undue burden" standard into the Title VII context. *Groff*, 600 U.S. at 471. In *Groff*, the Supreme Court held that when examining undue hardship, a court must take "into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'" *Id.* at 470-71. These costs need not be economic. *Hall v. Shepard Pratt Health Sys.*, No. 22-CV-3261, 2024 U.S. Dist. LEXIS 170870, at *23-*24 (D. Md. Sept. 20, 2024) ("Both pre- and post-*Groff*, courts can and must consider not just financial factors as part of the undue hardship analysis, but rather

a holistic 'assessment of a possible accommodation's effect on the conduct of the employer's business, not the bottom line alone.'").

Courts across the country, both pre- and post *Groff*, have held that allowing unvaccinated employees to continue work in a healthcare setting with vulnerable patients constitutes an undue hardship.  *See, e.g.*, *Wise v. Children's Hosp. Med. Ctr. of Akron*, No. 5:22-CV-02092, 2024 U.S. Dist. LEXIS 119686, at *6 (N.D. Ohio July 9, 2024) (granting summary judgment to the defendant hospital because allowing plaintiff to come to work "while remaining unvaccinated and untested creates a heightened health risk that constitutes an undue hardship."); *Bushra v. Main Line Health, Inc.*, No. 23-1090, 2023 U.S. Dist. LEXIS 229965, at *20 (E.D. Pa. Dec. 28, 2023) (granting summary judgment because allowing a physician to continue working in the emergency room would constitute an undue hardship under *Groff* as he had "frequent and direct contact with patients and staff"); *Devore v. Univ. of Ky. Bd. of Trs.*, No. 5:22-CV-00186, 2023 U.S. Dist. LEXIS 167239 (E.D. Ky. Sept. 18, 2023) (granting summary judgment to university because it would face undue hardship under *Groff* where an administrator, whose position required her to work on-site, sought to be exempted from COVID-19 vaccination and testing due to religious beliefs), *affirmed* No. 23-5890, 2024 U.S. App. LEXIS 25695 (6th Cir. Oct. 11, 2024); *Beuca v. Wash. State Univ.*, No. 2:23-CV-0069, 2023 U.S. Dist. LEXIS 88221, at *7-*8 (E.D. Wash. May 19, 2023) (dismissing plaintiff's claims and agreeing that "having unvaccinated internal medicine physicians would have imposed an undue hardship because it would have increased the risk of exposure to COVID-19 to patients and other healthcare workers"); *Dennison v. Bon Secours Charity Health Sys. Med. Grp., P.C.*, No. 22-CV-2929, 2023 U.S. Dist. LEXIS 84888, at *15 n.7 (S.D.N.Y. May 15, 2023) (dismissing plaintiff's claims, in part, due to the

"obvious hardship associated with the increased health and safety risk posed to other employees and patients by allowing Plaintiffs to remain unvaccinated" against COVID-19 while working); *Does v. Hochyl*, 632 F. Supp. 3d 120, 145 (E.D.N.Y. 2022) (dismissing plaintiff's claims, in part, because "exempting the plaintiffs from the vaccine requirement would expose vulnerable patients . . . as well as other healthcare workers to the COVID-19 virus, which is obviously a significant hardship.").

The facts established in this case show that in January and February 2022, when MetroHealth was evaluating the numerous requests for vaccine exemption, the number of positive COVID-19 cases, while declining in Cuyahoga County, remained high, and positivity rates at MetroHealth remained high as well.  (ECF #22-1, *Supplemental Declaration of Amanda Calabrese*, ¶ 4; ECF #55-2, *Supplemental Declaration of Amanda Calabrese*, ¶ 8).  Because of this, MetroHealth concluded that allowing unvaccinated employees who either provided direct patient care, were in other direct in-person patient-facing roles, or whose job responsibilities required them to work on-site, posed serious and unnecessary safety risks to co-workers, patients, and others at MetroHealth's hospitals and healthcare facilities.  (ECF #22-1, *Supplemental Declaration of Amanda Calabrese*, ¶ 5; ECF #55-2, *Supplemental Declaration of Amanda Calabrese*, ¶ 9).  The facts also show that, by mid-March, after Savel had resigned, MetroHealth concluded that there was a sufficient decline in positive cases of COVID-19 in Cuyahoga County such that it could amend its vaccination policy to reasonably accommodate unvaccinated employees whose essential functions could not be performed 100% remotely without creating an undue hardship, so long as those unvaccinated employees followed all other applicable COVID-19 safety precautions.  (ECF #22-1, *Supplemental Declaration of Amanda Calabrese*, ¶ 7; ECF

#55-2, *Supplemental Declaration of Amanda Calabrese*, ¶ 12).  MetroHealth's decision to amend its policy based on the data it was receiving on the ever-changing COVID-19 landscape was within its discretion and does not amount to evidence of an intent to discriminate based on religion.  *See Together Emples. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 433 (D. Mass. 2021) ("[T]his Court should not second-guess the hospital's judgment in matters of patient safety"), *aff'd* 32 F.4th 82 (1st Cir. 2022).

To the extent Plaintiff Savel may disagree with MetroHealth's assessment of the COVID-19 data, or the timing of the amendment of the vaccine policy, (*see* ECF #60, *Plaintiff's Opposition to Defendant's Motion for Summary Judgment*, pp. 6-8, PageID #3845-#3847), his subjective belief that the data existing in January and February 2022 did not support MetroHealth's decision to deny his, and others', COVID-19 vaccination exemption request does not establish discriminatory animus and is insufficient to defeat summary judgment.  *See Tibbs v. Calvary United Methodist Church*, 505 F. App'x 508, 514 (6th Cir. 2012) (noting that "arguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest*") (emphasis in original); *Carson v. Ford Motor Co.*, 413 F. App'x 820, 824 (6th Cir. 2011) ("The plaintiff's] subjective belief that [his employer's] proffered reason is false . . . is not sufficient to withstand summary judgment").

MetroHealth has established as a matter of law that granting Savel's vaccination exemption request at the time he requested it would have represented an undue hardship beyond the scope of reasonable accommodation.  Summary judgment is appropriate on his "failure to accommodate" claim.

-26-

**Plaintiff's Disparate Treatment Claim**

Nor does the evidence presented establish that MetroHealth treated Savel differently based on religion by "issu[ing] a blanket denial of all religious exemption requests" while granting medical exemption requests.  (ECF #2, *Complaint*, ¶¶ 33 & 38, PageID #13).

To establish a *prima facie* case of disparate treatment, a plaintiff must establish:  (1) his membership in a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for his position; and (4) that a person who was outside the protected class and similarly situated to him in all relevant respects was treated better than he was.  *Makar v. Cleveland Clinic Found.*, No. 1:19-CV-1185, 2021 U.S. Dist. LEXIS 45784, at *9-*10 (N.D. Ohio Mar. 11, 2021).

As already noted, Savel has not established that he suffered an adverse employment action or was constructively discharged.  (*See supra*, pp. 15-21).  Nor has he come forward with evidence to establish that others outside his protected class and similarly situated to him in all relevant respects were treated better then he was.

A disparate treatment claim is not supportable by comparing individuals in one protected class with those in a different protected class, measured under a separate statute with different standards, as Savel attempts to do by alleging a contrast between the handling of medical exemption requests (likely requiring ADA analysis) versus non-medical/religious exemption requests.  (*See* ECF #2, *Complaint*, ¶ 38, PageID #13) ("MetroHealth offered no explanation as to why some employees who requested a medical exemption to the vaccination requirements were able to be accommodated, but no employee who submitted a religious exemption request could be accommodated").  To satisfy the "similarly situated" requirement, Savel and those he

-27-

wishes to compare "must have dealt with the same supervisor, have been subject to the same standards[,] and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them." *See Goldblum v. University of Cincinnati*, 62 F.4th 244, 255 (6th Cir. 2023). Moreover, to establish a disparate treatment claim, "the employees to whom the plaintiff seeks to compare himself must 'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Here, Savel is not "similarly situated" to the individuals who submitted medical exemption requests, as is alleged in the *Complaint*. (*See* ECF #2, *Complaint*, ¶ 38, PageID #13). Medical exemption requests and religious exemption requests are on their face fundamentally different. Medical exemption requests generally relate to situations where the vaccine itself would cause the requester to experience adverse health consequences or physical harm (which, in itself, would seem to negate the reason for the vaccine in the first place, to promote personal and public health), whereas religious exemption requests typically do not present a situation where the requestor's physical health would be harmed or compromised, nor does such a request further the promotion of personal or public health. *See, e.g.*, *Thompson v. Asante Health Sys.*, No. 1:23-CV-00486, 2023 U.S. Dist. LEXIS 200693 (D. Or. Sept. 21, 2023) ("Here, for the fourth element, Plaintiffs allege that employees seeking medical exceptions to the vaccine mandate were "similarly situated" to Plaintiffs, who sought religious exceptions to the vaccine mandate. This allegation fails to meet even the minimal requirements of the prima facie case because

nothing indicates that seeking a medical exception is "similar conduct" to seeking a religious exception.") (dismissing disparate treatment claims, and citing *Groff v. DeJoy* for the proposition that "[t]he standards by which employers are required to accommodate religious requests and medical requests for exceptions to workplace requirements are not the same, . . . and conflating this standard with the medical standard and ADA case law would go too far.'"), *adopted and affirmed* 2023 U.S. Dist. LEXIS 199640 (D. Or. Nov. 7, 2023).

Additionally, there has not been any evidence produced by Savel that those who submitted medical exemption requests were treated more favorably than Savel (or any of the others who sought non-medical/religious exemptions).  The evidence produced shows that MetroHealth received 316 non-medical/religious exemption requests, 19 of which it initially approved, and 99 medical exemption requests, 12 of which it initially approved.  (ECF #55-2, *Supplemental Declaration of Amanda Calabrese*, ¶ 10, PageID #3697).  MetroHealth informed the employees whose exemption requests were denied, in connection with *both* medical exemption requests and non-medical religious exemption requests, that they had to get fully vaccinated and submit proof of vaccination within 45 days; MetroHealth also invited both sets of employees to explore job vacancies at MetroHealth that were fully remote.  (ECF #55-2, *Supplemental Declaration of Amanda Calabrese*, ¶ 11, PageID #3697).  All the evidence points to MetroHealth's decision to require vaccination for those employees who could not perform their roles 100% remotely as being solely to protect patients and fellow employees from infection, and not based on religion.

Finally, to the extent that Savel contends he was treated differently from his co-workers insofar as other COVID-19 safety protocols were relaxed for the employees who were

-29-

vaccinated, (*see* ECF #2, *Complaint*, ¶¶ 11-14, PageID #7-#8), any such differential treatment was based on vaccination status, and not religion, such that the "differential treatment" was not related to one's "protected class." *See Robertson*, 2023 U.S. Dist. LEXIS 141159, at *18 (S.D. Ohio Aug. 11, 2023) ("Vaccination status is not a class to which Title VII protections apply.").

## **CONCLUSION**

Accordingly, for each of these reasons – a failure to identify evidence of either a "failure to accommodate" Savel's request for a religious exemption from MetroHealth's COVID-19 vaccination policy or "disparate treatment" based on his protected class – the Court GRANTS Defendant MetroHealth System's *Motion for Summary Judgment* (ECF #55) on Plaintiff Frank Savel's claims of religious discrimination, as pled in Counts I (alleging violation of Title VII, 42 U.S.C, § 2000e, *et seq*.) and Count VI (alleging a violation of Ohio's anti-discrimination statute, Ohio Rev. Code § 4112) of the *Class Action Complaint for Injunctive Relief and Damages* (ECF #2).

Given this Court's ruling granting the *Motion for Summary Judgment*, resulting in a final dismissal of the case in its entirety, the following motions:  (1) *Defendant's Motion to Exclude Dr. Stan v. Smith's Expert Reports and to Preclude Dr. Smith from Providing Expert Testimony* (ECF #64); (2) *Defendant's and Non-Party Dr. Boutros' Motion to Quash Plaintiff's Subpoena Duces Tecum to Akram Boutros, M.D.* (ECF #66); and (3) *Plaintiff's Motion to Compel and* //

//

*Objection to the Supplemental Declaration of Amanda Calabrese* (ECF #68), are each DENIED as moot.

IT IS SO ORDERED.

_____
DONALD C. NUGENT
United States District Judge

DATED: October 25, 2024